UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; AND EARL L. HENRY, BONNIE J. LAURIA, RAYMOND B. BAILEY, THEODORE J. GENCO, MARVIN C. MARLOW, CHARLES R. MILLER, AND LAVERNE M. SORIANO, ON BEHALF OF THEMSELVES AND ALL OTHER PERSONS SIMILARLY SITUATED, | ) ) ) ) ) ) ) ) ) ) ) | CASE NO: 05-73991 HON. ROBERT H. CLELAND MAGISTRATE VIRGINIA M. MORGAN |
| PLAINTIFFS, | ) ) | CLASS ACTION |
| v. | ) ) | |
| GENERAL MOTORS CORPORATION, | ) ) | |
| DEFENDANT. | | |

**STIPULATED ORDER FOR SUBSTITUTION OF EXHIBITS**

This matter is presented to the Court by joint submission of all parties – Plaintiffs International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), Earl L. Henry, Bonnie J. Lauria, Raymond B. Bailey, Theodore J. Genco, Marvin C. Marlow, Charles R. Miller, and Laverne M. Soriano (collectively, "Class Representatives"), and Defendant General Motors Corporation ("GM") – for substitution of certain exhibits to their Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Proposed Class Notice (Docket # 27, filed Dec. 16, 2005). The revised documents to be substituted principally reflect the parties' completion, subsequent to filing the Joint Motion for Preliminary Approval, of the Trust Agreement for the DC-VEBA, a Voluntary

Employee Benefit Association trust which is an integral part of the parties' Settlement Agreement.

Specifically, the parties stipulate to the substitution of (i) the completed Trust Agreement for the unfinished draft that was filed as Exhibit 4 to the Settlement Agreement (which itself was Exhibit 1 to the Joint Motion for Preliminary Approval); and (ii) a revised version of the Proposed Class Notice (Exhibit 3 to the Joint Motion for Preliminary Approval), which incorporates in its description of the DC-VEBA the newly completed provisions of the Trust Agreement.  In addition, minor changes have been made in the joint letter of UAW and Class Counsel to Class Members that will accompany the Class Notice and is included as part of the Proposed Class Notice in Exhibit 3 to the Joint Motion for Preliminary Approval.

The revised Trust Agreement and Proposed Class Notice (with joint letter) that are to be substituted are attached to this Motion as Exhibits A and B, respectively.

It is, therefore, hereby ORDERED that:

1.  Exhibit A (attached) is substituted for Exhibit 4 to the Settlement Agreement that was identified as Exhibit 1 to the Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Proposed Class Notice.

2.  Exhibit B (attached) is substituted for Exhibit 3 to the Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Proposed Class Notice.


AGREED:

Dated: December 22, 2005

s/Julia Penny Clark
**JULIA PENNY CLARK (DC Bar 229609)**
**JOHN M. WEST (DC Bar 424718)**
**DOUGLAS L. GREENFIELD (DC Bar 415164)**
**Bredhoff & Kaiser, P.L.L.C.**
**805 Fifteenth Street, N.W.**
**Suite 1000**
**Washington, DC  20005**
**Telephone:  (202) 842-2600**
jpclark@bredhoff.com
jwest@bredhoff.com

**DANIEL W. SHERRICK (P37171)**
**MICHAEL F. SAGGAU (P35326)**
**8000 East Jefferson Avenue**
**Detroit, MI  48214**
**Telephone:  (313) 926-5216**
dsherrick@uaw.net
msaggau@uaw.net

*Counsel for Plaintiff UAW*

s/William T. Payne
**WILLIAM T. PAYNE (PA Bar 38083)**
**1007 Mt. Royal Boulevard**
**Pittsburgh, PA  15222**
**Telephone:  (412) 492-8797**
mailto:wpayne@stargate.net

**JOHN STEMBER (PA Bar 23643)**
**EDWARD FEINSTEIN**
**Stember Feinstein**
**1705 Allegheny Building**
**429 Forbes Avenue**
**Pittsburgh, PA  15219**
**Telephone:  (412) 338-1445**
jstember@stemberfeinstein.com
efeinstein@stemberfeinstein.com

*Counsel for Plaintiffs Henry, Lauria, Bailey,*
*Genco, Marlow, Miller, and Soriano and the*
*Class*

s/Richard C. Godfrey
**RICHARD C. GODFREY, P.C.**
**ANDREW B. BLOOMER**
**Kirkland & Ellis LLP**
**200 East Randolph Drive**
**Chicago, IL  60601**
**Telephone:  (312) 861-2482**
rgodfrey@kirkland.com
abloomer@kirkland.com

**EUGENE DRIKER    (P12959)**
**DANIEL M. SHARE   (P 26903)**
**Barris, Sott, Denn & Driker, P.L.L.C.**
**211 West Fort, 15th Floor**
**Detroit, MI  48226**
**Telephone:  (313) 965-9725**
edriker@bsdd.com
dshare@bsdd.com

**FRANCIS S. JAWORSKI (P27199)**
**EDWARD W. RISKO (P36699)**
**Office of General Counsel**
**General Motors Corporation**
**300 Renaissance Center**
**Detroit, MI 48236**
**Telephone:  (313) 665-4914**
francis.s.jaworski@gm.com
edward.w.risko@gm.com

*Counsel for Defendant General Motors*
*Corporation*

 S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  December 22, 2005


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 22, 2005, by electronic and/or ordinary mail.


 S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA; and EARL L. HENRY, BONNIE J. LAURIA, RAYMOND B. BAILEY, THEODORE J. GENCO, MARVIN C. MARLOW, CHARLES R. MILLER, AND LAVERNE M. SORIANO, on behalf of themselves and all other persons similarly situated, | ) ) ) ) ) ) ) ) ) ) | Case No: 05-73991 |
| | ) ) | Hon. Robert H. Cleland Magistrate Judge Virginia M. |
| PLAINTIFFS, | ) ) | Morgan |
| v. | ) ) | CLASS ACTION |
| GENERAL MOTORS CORPORATION, | ) ) | |
| DEFENDANT. | ) | |

**IMPORTANT NOTICE ABOUT HEALTH CARE BENEFITS
FOR GM/UAW RETIREES AND THEIR FAMILIES**

You should read this Notice carefully if You were, as of November 11, 2005:

3.     A *GM/UAW hourly employee* who had retired from GM with eligibility to participate in retirement in the GM Health Care Program for Hourly Employees; or

4.     The *spouse, surviving spouse, or dependent* of a GM/UAW hourly employee who, as of November 11, 2005, was eligible for post-retirement or surviving spouse health care coverage under the GM Health Care Program for Hourly Employees as a consequence of a GM/UAW hourly employee's retirement from GM or death prior to retirement.

This Notice is about your rights to receive retiree health care benefits from GM, and

about a proposed settlement of a lawsuit that may affect those rights.

## **THE PURPOSE OF THIS NOTICE**

**This is an official Notice from the United States District Court for the Eastern District of Michigan, Southern Division.  There is a class action lawsuit pending in this Court and a proposed Settlement Agreement of that lawsuit has been presented to the Court for approval.  If you fit within any part of the definition in the preceding section, you are part of the class, a "Class Member."**

**The Court has granted preliminary approval to the Settlement Agreement and has scheduled a Hearing where Class Members can give their views on the proposed settlement.  The Settlement Agreement will not take effect unless the Court decides, after that Hearing, that the Settlement Agreement is fair to the Class and should be finally approved.  The Court has not yet made that decision.  If the Court does give final approval to the Settlement Agreement, the Agreement will affect the rights of all members of the Class.**

**This Notice explains the Settlement Agreement so that you can decide whether you want to object to the Settlement Agreement and ask the Court not to approve it.  This Notice also explains what you must do if you want to make such an objection.  If you do not object to the Settlement Agreement, you do not need to do anything.**

## NATURE OF THE LAWSUIT

Through what is called the GM Health Care Program for Hourly Employees or the "Current GM Plan," GM currently provides health care benefits to persons who are eligible former employees who were represented by the UAW and who are retired, and to the spouses, surviving spouses, and dependents of former GM employees represented by the UAW who are eligible for post-retirement or surviving spouse health care coverage under the Current GM Plan.  This case arises from GM's decision to unilaterally modify those retiree health care benefits.  The lawsuit was filed in October 2005 by two GM retirees — Earl Henry and Bonnie Lauria — and by the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW").  Four additional GM retirees — Raymond B. Bailey, Theodore J. Genco, Marvin C. Marlow, and Charles R. Miller — and one surviving spouse of a GM retiree, Laverne M. Soriano, have joined the lawsuit since its filing.  The UAW and the retirees who filed the lawsuit are the Plaintiffs.

The Plaintiffs allege in the lawsuit that hourly health care benefits in retirement are vested and unalterable, which, if they are correct, means that GM cannot unilaterally modify or change them. GM denies that health care benefits in retirement are vested or unalterable, claiming that it has expressly reserved the right to change retiree health care benefits and that it must do so to address GM's rising health care costs and financial crisis.  GM maintains that failure to implement changes to retiree health care coverage will have serious adverse financial and business consequences for GM.

The Court has not decided which of the parties is right concerning GM's obligations, if any, to provide health care benefits to GM retirees, their spouses, surviving

spouses, and dependents.  However, the Plaintiffs and GM have reached a compromise and have asked the Court to approve a Settlement Agreement that would resolve the case without a Court ruling on GM's obligations.

## THE CLASS

The Court has ruled that for purposes of considering the proposed Settlement Agreement, this lawsuit will be certified as a class action on behalf of all former GM hourly employees who were represented during their employment by the UAW in collective bargaining and who were retired from GM as of November 11, 2005 under circumstances that made them eligible in retirement to participate in the GM Health Care Program for Hourly Employees, along with the spouses, surviving spouses and dependants of former GM employees who were represented by the UAW and who were eligible for post-retirement or surviving spouse health care coverage under the GM Health Care Program for Hourly Employees because of a GM/UAW hourly employee's retirement from GM or death prior to retirement on or before November 11, 2005.

This means that GM's retiree health care obligations with respect to Class Members will be determined by the proposed settlement (described below) if that settlement is approved by the Court.

## THE PROPOSED SETTLEMENT

The Plaintiffs and GM have agreed to a settlement that, if approved by the Court, will be a full and final settlement of the retiree health benefit claims of all Class Members against GM asserted in the lawsuit. The Settlement Agreement will remain in effect until September 14, 2011, and may remain in effect after that date. After September 14, 2011, either GM or the UAW may terminate the Settlement Agreement. If the Settlement Agreement is terminated, the terms of the Settlement Agreement will no longer apply, except as otherwise provided therein, and all parties will return to the same position as they are in now. The period between the date when the Settlement Agreement takes effect and the termination of the Settlement Agreement is described below as "the term of the Settlement Agreement." As explained, it may be that the Settlement Agreement is never terminated, in which case the term of the Settlement Agreement will continue and the provisions in the Agreement will remain in effect.

If the Settlement Agreement is approved by the Court, the Class Members will not be able to sue GM to have their previous retiree health benefits restored during the term of the Settlement Agreement. If the Settlement Agreement is later terminated, Class Members may not sue GM over retiree health benefits that were provided in accordance with the Settlement Agreement while the Settlement Agreement was in effect or which Class Members claim should have been provided during that time period. But Class Members do not waive any other right to sue over benefits provided — or that Class Members claim should be or should have been provided — after termination of the Settlement Agreement.

A copy of the entire Settlement Agreement is enclosed with this Notice. To help you

understand it, a brief summary of the Agreement follows.  In addition, the UAW and Class Counsel have enclosed a joint letter explaining why they think you should support the Settlement Agreement.  You should read all of these materials carefully.

If the Settlement Agreement becomes effective, GM will continue to provide retiree health care benefits to all eligible Class Members under the terms of the Settlement Agreement.  Active GM hourly employees have already agreed to certain changes to their health care coverage.  In general terms, the Settlement Agreement provides for certain increases in retiree health care costs for most Class Members, including, but not limited to, monthly contributions, annual deductibles, increased prescription co-payments, and other cost-sharing mechanisms.  But the Settlement Agreement also contains three basic safeguards designed to lessen the overall financial impact on Class Members.

First, health care benefits for "Protected Retirees" — those GM retirees or their surviving spouses whose annual GM pension income as defined in the Settlement Agreement is $8,000 or less and whose pension benefit rate is $33.33 or less per month per year of credited service — will generally remain the same as benefits under the Current GM Plan.

Second, the dollar amounts for items such as your monthly contributions, co-payments, deductibles, and out-of-pocket maximums will increase at a rate of no more than three percent per year.

Third, the Settlement Agreement requires that GM and the UAW establish what is called a defined contribution voluntary employees' beneficiary association trust (the "DC-VEBA") that will be funded by GM and by active GM hourly employees in various ways.  The DC-VEBA will be used to reduce the monthly contributions, deductibles, out-

of-pocket maximums, and other retiree health care costs to be paid by affected Class Members in the Modified Plan, and will fund the dental plan. More details about the DC-VEBA are provided in Section V of this Notice.

Assuming the Settlement Agreement becomes effective, Class Members other than "Protected Retirees" will be automatically enrolled in what is called the Modified GM Plan, unless they choose to enroll in what is called the Catastrophic Plan. These plans, and persons who are covered by these plans, are more fully described in Sections I and II below. "Protected Retirees" have the same coverage they currently have, with the exceptions described in Section IV below.

III.   THE MODIFIED GM PLAN.

Who Does The Modified GM Plan Cover?  The Modified GM Plan will provide health benefits to all Class Members except "Protected Retirees" (see Section IV below). Class Members who are GM retirees or surviving spouses and receive benefits under the Modified GM Plan are referred to as "General Retirees." General Retirees who fail to pay the monthly contributions required by the Modified GM Plan, choose to enroll in the Catastrophic Plan, or decline GM health care coverage completely will be enrolled in the Catastrophic Plan, which is described below.

What Does The Modified GM Plan Provide?  The Modified GM Plan is based on the Current GM Plan, but includes certain changes. As described more fully below, assets of the DC-VEBA may be used to offset the health care costs of General Retirees covered under the Modified GM Plan.

The Modified GM Plan changes the Current GM Plan in two ways: through what are called "administrative changes" and "plan design changes."   Here is a summary of these

changes:

**Administrative Changes**:  Administrative changes in the Modified GM Plan include, for example:

 (i) modifications in the way benefits are coordinated with benefits provided by Medicare Part B;

(ii) elimination of payments for non-covered cosmetic surgery;

(iii) modified out-of-network referral process for the Preferred Provider Organization (PPO) option;

(iv) limitations on GM's responsibility for all fees charged above those reasonable and customary;  and

(v) implementation of prescription drug tools.

More information concerning Administrative Changes is set forth in Exhibit 1 to the Settlement  Agreement.

**Modified GM Plan Design Changes**:  As described below, the amounts that **General Retirees** must pay under the Modified GM Plan for monthly contributions, deductibles, co-payments, and out-of-pocket maximums will be reduced by payments from the DC-VEBA to GM and/or health care providers, insurance carriers, or similar entities.  Initially, the reductions will be to the amounts identified below, but those reductions are subject to change from time to time; the DC-VEBA Committee, whose members will be independent of GM, will make decisions about amounts to be paid from the DC-VEBA for this purpose.  Those decisions may be affected by various economic factors which will impact the value of assets in the DC-VEBA.

The plan design changes for the Modified GM Plan include:

**Monthly Contributions**: The Modified GM Plan will require monthly contributions of $50 for single participants and $105 for family coverage, but DC-VEBA assets will be used to reduce these monthly contribution amounts, initially to $10 for

single participants and $21 for family coverage.  In other words, if you are single, your monthly contribution initially will be $10.  If more than one person is covered, your monthly contribution for all family members combined initially will be $21.  Those contribution amounts will initially apply to all coverage options under the Modified GM Plan, including the Traditional Care Network ("TCN"), the Preferred Provider Organization ("PPO"), and Health Maintenance Organization ("HMO") options.

TCN and PPO Deductibles: If your coverage is through TCN or a PPO, the Modified GM Plan will require annual deductibles of $300 for single participants with an aggregate cap of $600 for family coverage.  DC-VEBA assets will be used to reduce these deductibles, initially to $150 for single participants with an aggregate cap of $300 for family coverage.   Monthly contributions, prescription medication co-payments, emergency room co-payments, and certain other cost-sharing items will not apply to meeting the TCN and PPO deductible amounts.

TCN and PPO Co-Insurance:  After the applicable annual deductible has been met and until the applicable out-of-pocket maximum is reached, participants in the Modified GM Plan will be required to pay 10% of their covered health care costs for in-network services and 30% for out-of-network services.  This is referred to as "co-insurance."  The Modified GM Plan therefore requires 10% co-insurance for in-network health care services and 30% co-insurance for out-of-network health care services.  These percentage payments are limited to the "out-of-pocket" maximums described below.  Also, office visit co-payment levels are not changed.

Prescription Drugs: The Modified GM Plan provides for the following prescription drug co-payments: (1) for medications purchased at retail (up to a 34-day supply), there

will be a $5 co-payment for generic medications, a $10 co-payment for brand-name medications, and a $15 co-payment for erectile dysfunction medications; (2) for medications purchased through mail order (up to a 90-day supply), the co-payment will be $10 for generic medications, $15 for brand-name medications, and $18 for erectile dysfunction medications.

**Emergency Room Services**: The Modified GM Plan will require a co-payment of $50 per emergency room visit.  However, this co-payment will be waived, meaning you will not have to pay it, if you are admitted to the hospital.

**TCN and PPO Out-of-Pocket Maximums**:

**(4)  For** *In-Network* **TCN and PPO health care services, the Modified GM Plan provides for a $500 out-of-pocket maximum for single participants and a $1,000 out-of-pocket maximum for family coverage.  Those in-network out-of-pocket maximums initially will be reduced to $250 for single participants and $500 for family coverage by payments from the DC-VEBA.**

**(5)  For** *Out-of-Network* **TCN and PPO health care services, the Modified GM Plan provides for a $1,000 out-of-pocket maximum for single participants and a $2,000 out-of-pocket maximum for family coverage.  Those out-of-pocket maximums for out-of-network services initially will be reduced to $500 for single participants and $1,000 for family coverage by payments from the DC-VEBA.**

**(6)  *Coordination of Deductibles, Contributions and Co-Payments with Out-Of-Pocket Maximums*:  Under the Modified GM Plan, deductibles will apply to the out-of-pocket maximum, but monthly contributions, prescription drug co-payments, emergency room co-payments, and certain other cost-sharing items will not apply to the out-of-pocket maximum.**

**HMO Modifications**:  **In 2006, HMOs will have the same prescription drug co-payments and monthly contributions as the Traditional Care Network.  Beginning in 2007, HMO benefits and contributions will be modified so that their net cost to the company is the same as the cost of TCN.**

IV.    THE CATASTROPHIC PLAN.

**Who Does The Catastrophic Plan Cover?**  This program will provide coverage for catastrophic health care expenses for Class Members, other than Protected Retirees, who choose to enroll in the Catastrophic Plan, as well as General Retirees who fail to pay the monthly contributions required by the Modified GM Plan who will be enrolled in the Catastrophic Plan.  Class Members who receive benefits under the Catastrophic Plan are referred to as "Non-Participating Retirees."

Non-Participating Retirees receive none of their benefits from the Modified GM Plan.  Assets of the DC-VEBA may not be used to offset the health care costs of Non-Participating Retirees, but may be used to finance their dental care coverage.  All Class Members other than Protected Retirees will have the option to voluntarily enroll in the Catastrophic Plan during the initial enrollment period.  Keep in mind that any General Retirees who fail to pay the monthly contributions required by the Modified GM Plan will be enrolled, by default, into the Catastrophic Plan.

**What Does The Catastrophic Plan Provide?**  The Catastrophic Plan will have no required monthly contribution, but it provides for higher deductibles, higher out-of-pocket maximums, higher emergency room co-payments, and higher prescription drug co-payments than the Modified GM Plan.  Specifically, annual deductible payments under the Catastrophic Plan will be $1,250 for single participants with an aggregate cap of $2,500 for family coverage.  After the deductible amount is met and until their applicable out-of-pocket maximum has been reached, participants in the Catastrophic Plan will be required to pay 10% of their covered health care costs for in-network services and 30% of their covered health care costs for out-of-network services.  Office visit co-payment levels are not changed.

Out-of-pocket maximums for the Catastrophic Plan will be $2,500 for single participants and $5,000 for family coverage for in-network health care services, and $5,000 for single participants and $10,000 for family coverage for out-of-network health care services.  Emergency room co-payments will be $100 per emergency room visit.  However, this co-payment will be waived, meaning you will not have to pay it, if you are admitted to the hospital.

For medications purchased at retail (up to a 34-day supply), the Catastrophic Plan requires a $15 co-payment for generic medications, a $35 co-payment for brand-name medications, and a $50 co-payment for erectile dysfunction medications.  For medications purchased by mail order (up to a 90-day supply), the Catastrophic Plan requires a $30 co-payment for generic medications, $70 for brand-name medications, and $100 for erectile dysfunction medications.

The assets of the DC-VEBA will not be used to reduce any costs payable by the participants under the Catastrophic Plan.  The dollar amounts for items under the Catastrophic Plan such as prescription drug co-payments, deductibles, and out-of-pocket maximums will increase at a rate of no more than three percent per year.

V.      **DENTAL PLAN COVERAGE.**

Under the Modified GM Plan, GM will no longer fund dental plan coverage; instead, such coverage will be financed exclusively through the DC-VEBA.  It is anticipated that the assets of the DC-VEBA will initially cover 100% of the costs of the claims and administration for dental coverage that would have been paid under the Current GM Plan.

VI.     **PROTECTED RETIREES.**

**Who Are "Protected Retirees"?**  Protected Retirees are Class Members who are entitled to an annual GM pension benefit of $8,000 or less (excluding lump sum payments) and whose pension benefit rate is $33.33 or less per month per year of credited service.

**What Coverage Is Provided For Protected Retirees?**  Health care coverage for Protected Retirees remains the same as it is under the Current GM Plan, with two exceptions.  **First,** Protected Retirees will be subject to the Administrative Changes incorporated into the Modified GM Plan (see Section I of this Notice above).  **Second,** Protected Retirees will be subject to the same changes in dental plan coverage as participants in the Modified GM Plan.  In other words, dental coverage will no longer be provided by GM, and will instead be financed exclusively through the DC-VEBA.  It is anticipated that the assets of the DC-VEBA initially will cover 100% of the costs of the claims and administration that would have been paid under the Current GM Plan.

VII.   **SUMMARY AND DETAILS OF THE DC-VEBA.**

If the Court approves the Settlement Agreement, all Class Members will be subject to retiree health care changes and will be covered by one of the retiree health care plans described in this Notice.  Under the Modified GM Plan, General Retirees' financial contributions initially will be reduced to the levels set out above by payments made from the DC-VEBA to GM and/or health care providers, insurance carriers, or similar entities. The DC-VEBA will be administered by a DC-VEBA Committee independent of GM.  The Committee will not include any GM representatives.  The DC-VEBA will be funded in five different ways: (1) Cash Contributions; (2) Profit Sharing; (3) Wage Deferrals; (4) Stock Appreciation; and (5) Dividends.  These funding methods are as follows:

<u>Cash Contributions</u> — GM will make three separate $1 billion cash contributions to the DC-VEBA, amounting to a total of $3 billion.  The first $1 billion contribution will be made as soon as practicable after the Settlement Agreement is approved by the Court, but no later than 30 days thereafter.  The second $1 billion contribution will be made one year later, and the third $1 billion contribution will be made in 2011.  However, if at any point after the second $1 billion contribution is made the value of the assets in the DC-VEBA drops below $600 million as of the last day of a month, the third $1 billion contribution will be accelerated and GM will make it 15 days after the last day of that month.

<u>Profit Sharing</u> — GM will contribute to the DC-VEBA an amount based on the health care savings resulting from the changes in the Settlement Agreement.  The amount contributed will be equal to the dollar impact of such savings on profit sharing payments that would otherwise be paid to profit sharing plan participants.  The minimum amount

GM will contribute for each of the years 2006-2012 will be $30 million per year.

**Wage Deferrals** — Active UAW-represented GM employees will forgo an average of $1 per hour in deferrals of future wage increases and future cost-of-living allowance (COLA) increases consisting of (i) a total of 17 cents per hour of COLA (up to 6 cents per quarter); (ii) a 3% wage increase scheduled for September 2006. In addition, 2 cents per hour of COLA increases in subsequent quarters will also be deferred. GM will contribute to the DC-VEBA amounts equivalent to those deferrals.

**Stock Appreciation** —  GM will make cash contributions to the DC-VEBA based on the increase, if any, in the per share price of GM Common Stock over $26.75 (the average price of GM Common for the week ended October 14, 2005), with respect to the equivalent of eight million shares of GM Common Stock. One third of the eight million share equivalents will be made available on each of three different dates: the date the court enters an order approving the Settlement Agreement, one year from that date, and two years from that date. At any time after the date on which the share equivalents are made available, the Committee may request a cash contribution on all or any portion of such shares with respect to which the Committee has not previously received a contribution. Each cash contribution will be based on the difference between (a) the average share price of GM Common Stock in the five days preceding its respective calculation date and (b) $26.75, multiplied by (c) the number of share equivalents for which the Committee requested a contribution under the terms of the Settlement Agreement. GM's obligation to make contributions under this arrangement expires three years after the Effective Date of the Settlement Agreement.

**Dividends** — If GM raises its quarterly cash dividend above 50 cents per share

before September 14, 2011, GM will place an amount equivalent to four quarters of such

dividend increase in the DC-VEBA. If GM declares any distribution other than a regular

quarterly cash dividend, a cash contribution will be made to the DC-VEBA in an amount

determined by a formula set forth in the Settlement Agreement.

  <u>Structure and Operation of the DC-VEBA.</u> - The DC-VEBA will be governed by
a Committee, consisting of seven (7) people. Three of the seven will be appointed by the
UAW. Four of the seven will be members of the public not affiliated with GM or the
UAW. The names and biographical information on the public members can be found in
Attachment 1 to the Trust Agreement, which is included as Exhibit 4 to the Settlement
Agreement. Further details about the structure and operation of the Committee can be
found in the Trust Agreement itself, particularly in Section 7.
  Under the terms of the Trust Agreement, the Committee will be responsible for
investing the assets of the DC-VEBA and using those funds to reduce participant health
care costs as described in the Settlement Agreement. Until December 31, 2011, the
Committee is required to maintain a level of reduction to participant health care costs on
the same basis as the initial levels, described above. Thus, for example, for this period the
Committee is required to continue to reduce 80% of the monthly contributions that would
otherwise be required under the Modified GM Plan. As those Contributions increase
with inflation (subject to the 3% cap), the DC-VEBA will continue the same level of
reduction, and, as a result, the $10 monthly contribution required of single General
Retirees will increase by up to 3%, i.e., $10.30 in the second year.
  Under the terms of the Trust Agreement, the Committee will also have discretion
to modify these reduction amounts, based on the assets available to the DC-VEBA and
other relevant factors, after December 31, 2011. At that time -- if the Settlement
Agreement is still in effect -- the Committee will review the assets of the Trust and will
establish a level of reduction, which, in the judgment of the Committee, can be sustained
for the following twenty year period. It is impossible to know at this point whether the
Committee will determine to increase or decrease the level of reduction, or keep it the
same at that time. The answer will depend on the assets of the Trust and other economic
factors.
  The ability of the DC-VEBA to cover portions of retiree health care costs is not
guaranteed by GM and will depend on various economic factors which will impact the
value of assets in the DC-VEBA.

***

  The UAW, Class Representatives, and Class Counsel have concluded that, without

the retiree health plan modifications described in this Notice and the significant and

immediate savings they would provide to GM, there is a serious danger that GM's

financial condition — and its ability to continue to provide retiree health care benefits —

will continue to deteriorate. If GM regains its financial strength, contributions to the DC-VEBA that relate to appreciation of GM common stock, profit sharing payments, and potential dividend increases will increase the DC-VEBA funds available to reduce the financial impact of the health care modifications on Class Members.

If the Court approves the Settlement Agreement, no Class Member will be able to sue GM over retiree health benefits that were provided in accordance with the Settlement Agreement while the Settlement Agreement was in effect or which Class Members claim should have been provided during that time period.

In order to provide a brief, readable summary of the Settlement Agreement, this Notice has omitted much of the technical detail that the Settlement Agreement contains. If there are any differences between the contents of this Notice and the contents of the Settlement Agreement, it is the Settlement Agreement — which is enclosed in its entirety with this Notice — that governs.

## ATTORNEY'S FEES

Under the terms of the Settlement Agreement, GM will pay Class Counsel attorneys' fees and other professional fees at reasonable hourly rates, and will also pay other costs incurred in connection with this court proceeding.

Class Counsel's application and brief supporting the fee award will be filed with the Court within two weeks of your receipt of this Notice and any Class Member's objections may address the proposed fee award, as well as any other part of the proposed settlement.

## HEARING

The Court has scheduled a hearing before the Honorable Judge Robert H. Cleland at the Theodore Levin United States Courthouse, 231 W. Lafayette Blvd., Room 707, Detroit, Michigan 48226, begining on March 6, 2006. The purpose of that hearing is to help the Court determine whether the proposed Settlement Agreement is fair, reasonable, and in the best interests of the Class, and whether to give final approval to the settlement.

You do not have to come to the hearing. The lawyers for the Class will attend the hearing on behalf of the Class. However, if you want to come, you may appear at the hearing, with or without your own lawyer. Class Members do not have the right to request exclusion from the class action. But any member of the Class who objects to the proposed Settlement Agreement will have an opportunity to tell the Court why he or she believes that the proposed Settlement Agreement should not be approved. No person will be heard at the hearing, however, unless he or she files an objection in writing with the Court postmarked on or before February 13, 2006.

Any objection should bear the following heading: *"Int'l Union, UAW, et. al. v.*

*General Motors Corporation*, **Case No. 05-73991, Objections to Proposed Settlement Agreement." The objection should be mailed to the Clerk of the Court, United States District Court for the Eastern District of Michigan, Southern Division, at the following address: Theodore Levin United States Courthouse, 231 W. Lafayette Blvd., Detroit, Michigan 48226. Class members should also send copies of any objection to each of the following, postmarked by February 13, 2006: (a) Class counsel, John Stember, Stember Feinstein, 1705 Allegheny Building, 429 Forbes Avenue, Pittsburgh, PA 15219; (b) UAW Associate General Counsel, Michael F. Saggau, International Union UAW, 8000 East Jefferson, Detroit, Michigan 48214; and (c) GM Counsel, Edward W. Risko, General Motors Corporation, 300 Renaissance Center, Detroit, Michigan 48236.**

**If, after the hearing, the Court determines that the proposed Settlement Agreement is fair and reasonable and in the best interests of Class Members, the Court will enter a final judgment approving the settlement. Once final, that judgment will be binding on all Class Members, including those who filed objections and those who did not.**

## **FURTHER INFORMATION**

A copy of this Notice and the Settlement Agreement is being sent to all known Class Members and these documents are also available on the Website of Class Counsel at http://www.stemberfeinstein.com.  Class Members may also request copies of the proposed Settlement Agreement by writing Class Counsel, John Stember, Stember Feinstein, 1705 Allegheny Building, 429 Forbes Avenue, Pittsburgh, PA  15219 or by calling 1-800-295-4916.  The proposed Settlement Agreement may also be inspected during business hours in the Office of the Clerk of the Court for the United States District Court for the Eastern District of Michigan, Southern Division, Theodore Levin United States Courthouse, 231 W. Lafayette Blvd., Detroit, Michigan 48226; at the UAW offices at 8000 East Jefferson Avenue, Detroit, Michigan 48214; and at the offices of all counsel for the Plaintiffs as found on the last few pages of the enclosed Settlement Agreement.

Any member of the Class who does not file a written objection as this Notice specifies shall be deemed to have waived his or her objection(s) and shall be forever barred and precluded from making any objection to the fairness or adequacy of the proposed Settlement Agreement.

**Honorable Robert H. Cleland, District Judge**

**A MESSAGE TO UAW GENERAL MOTORS RETIREES
FROM THE UAW AND CLASS COUNSEL IN *UAW & HENRY ET AL. v. GM***

December 22, 2005

Dear UAW GM Retiree:

In the report the UAW sent to you in October, the UAW outlined the tentative agreement on health care that was reached between the UAW and General Motors and advised you court approval was required before it would become effective.

Enclosed you will find an official notice from the United States District Court for the Eastern District of Michigan informing you of the proposed settlement that the parties have agreed to in *UAW & Henry et al. v. General Motors,* No. 05-73991.  As explained in the notice, the settlement of this class action lawsuit, if approved by the court, will result in certain changes in the health-care benefits GM provides to its retired hourly employees, surviving spouses, and their eligible dependents.  The notice summarizes these changes and explains the procedures through which you, as a class member, can object to the proposed settlement if you wish to do so.

We are writing to emphasize to you that the proposed settlement has the full support of the UAW and of your class representatives in this litigation.  In view of GM's precarious financial situation, it is our firm conviction that without this agreement your health-care benefits would be seriously endangered.

This determination was based on a comprehensive analysis of GM's finances.  In addition to having full access to GM's financial data the UAW engaged a team of internationally respected firms – financial advisers, lawyers, and actuaries – to help evaluate this information.  The analysis made it clear that in order to provide UAW-represented GM retirees and surviving spouses long-term protection for their health-care benefits, action had to be taken sooner rather than later.

Subsequently, counsel for the class of GM retirees – with the assistance of their own financial experts – independently analyzed the same data and came to the same conclusion.  Those counsel – Bill Payne and the Stember Feinstein firm of Pittsburgh, whom the court has appointed to represent the class – have helped draft and join in this letter.  Mr. Payne is a long-time advocate for the interests of working men and women, and his work has focused in the area of employee and retiree benefits.  Mr. Payne spent nearly a decade as an in-house lawyer for the United Steelworkers of America, and for the last 15 years he has been in private practice.  For over 20 years, he has represented retirees and unions in retiree health-care disputes.  In working for the class, he is joined by Stember Feinstein, which also has considerable experience in retiree health-care litigation and other class actions.

After undertaking their independent investigation of GM's financial condition, class counsel reached the conclusion that GM's financial ability to provide the health-care benefits promised to retirees was questionable unless significant cost-savings measures were instituted. Mr. Payne and Stember Feinstein further concluded that the proposed settlement of this litigation was fair, reasonable, and adequate, and was in the best interests of the class members.

The settlement, which was reached after months of difficult and contentious negotiations between UAW and GM, will result in a modest increase in your health-care costs, but you will continue to enjoy benefits that are among the best of those provided to any workers and retirees in America, at far less cost than most.

Details of the agreement are summarized in the court's notice and are fully set out in the Settlement Agreement, which is also enclosed. Our ability to keep the increase in retirees' costs for their health-care coverage at affordable levels has been due to the willingness of current GM employees – who have already ratified the proposed settlement – to defer future wage and COLA increases in order to help fund retiree health-care benefits. We urge you to study carefully the enclosed documents, which set forth the provisions of the settlement agreement in full.

If the court approves the settlement, it will apply to you and all other members of the class. The court has scheduled a hearing beginning on March 6, 2006, at the Theodore Levin United States Courthouse, 231 W. Lafayette Blvd., Room 707, Detroit, Michigan 48226, to determine whether to do so. If you wish to file an objection to the proposed settlement, you must do so in writing, as explained in the notice, on or before February 13, 2006. If you support the settlement, you need not do anything.

The proposed settlement is the result of long, difficult, and complex negotiations. While the settlement will increase what you must pay for your health care, we believe that the alternative would be the very serious risk of far more drastic reductions or the complete elimination of GM's retiree health-care benefits.

We have carefully considered all of the alternatives and have concluded that this settlement is the best solution for GM retirees in these difficult circumstances. We therefore recommend that you do not object to the proposed settlement.

Very truly yours,

**RICHARD SHOEMAKER**

**Vice President and Director**
**UAW General Motors Department**
**8000 East Jefferson Avenue**
**Detroit, MI  48214**

**WILLIAM T. PAYNE**
**JOHN STEMBER**
**EDWARD J. FEINSTEIN**

**Stember Feinstein**
**1705 Allegheny Building**
**429 Forbes Avenue**
**Pittsburgh, PA  15217**
**Email:  info@stemberfeinstein.com**
**www.stemberfeinstein.com**

**Enclosures**

**Class Counsel**

**EXHIBIT B**

**EXHIBIT 4: DRAFT** FORM

# GENERAL MOTORS DEFINED CONTRIBUTION
# RETIREE HEALTH BENEFIT TRUST

**THIS AGREEMENT OF TRUST** (hereinafter referred to as the "Trust Agreement") is made and entered into on this _____, by and between General Motors Corporation, a corporation organized under the laws of the State of Delaware (hereinafter referred to as the "Company"), and _____, a national banking association (hereinafter referred to as the "Trustee").

**W I T N E S S E T H:**

**WHEREAS,** the Company and the UAW have entered into a Settlement Agreement that, subject to Court approval of the Settlement Agreement, provides for the Company to provide post-retirement health care benefits to certain Class Members and Future Retirees in accordance with the terms of a Modified Plan and also provides for dental coverage to be provided to certain Class Members and Future Retirees through a DC VEBA;

**WHEREAS,** all defined terms used herein but not defined herein shall have the meaning attributed to them in the Settlement Agreement;

**WHEREAS,** in order to implement and carry out the terms of the Settlement Agreement, and for purposes of providing health care benefits (a) by Mitigating monthly Contributions, deductibles, out-of-pocket maximums, and/or co-insurance payable by General Retirees and Future Retirees except for prescription drug co-payments, office visit coinsurance, or other HMO cost sharing amounts (*e.g.*, office visit co-payments or emergency room co-payments), (b) in the limited circumstances described in Section 14.E.1 of Settlement Agreement, by reimbursing the Company for costs incurred in providing health care benefits to Class Members and Future Retirees and their dependents and spouses, (c) by providing dental coverage for Class Members and Future Retirees, either by reimbursing the Company or by directly providing such benefits as described in the Settlement Agreement, and (d) in the event that the Settlement Agreement has been terminated and the Company has modified the terms of benefits available for Class Members under the Modified Plan, to provide any health care benefits that the Committee (as hereinafter defined) deems appropriate from the Trust Fund (as hereinafter defined) other than the portion of the Trust Fund that is to be used to reimburse the Company for the cost of providing health care for Class Members and Future Retirees as set forth in Section 14.E.1. of the Settlement Agreement, the General Motors Defined Contribution Retiree Health Benefit Trust (hereinafter referred to as the "Trust") is established. During the Effective Period, the Trust Fund will not be used to Mitigate any costs payable by the participants in the Catastrophic Plan (other than dental benefits as described in the Settlement Agreement).  The Trust is intended to satisfy the requirements of the Employee

Retirement Income Security Act of 1974, as amended ("ERISA"), and constitute a "voluntary employees' beneficiary association" under Section 501(c)(9) of the Internal Revenue Code of 1986, as amended (the "Code").  The parties further intend that the Trust qualify as a welfare benefit fund described under Section 419A(f)(5)(A) of the Code;

WHEREAS, this Trust Agreement provides for management and control of the assets in connection with the Programs (as hereinafter defined) through a trust fund held for the exclusive benefit of the Participants (as hereinafter defined);

WHEREAS, _____ has agreed to act as Trustee hereunder and to hold and administer such sums as are transferred or contributed upon the terms set forth herein; and

WHEREAS, a Committee (as defined below) has been appointed with the sole and exclusive authority to control and manage the ongoing operation of the Trust.

NOW, THEREFORE, the Company and the Trustee hereby agree to establish the GM Defined Contribution Retiree Health Care Trust, subject to the following terms and conditions.

ARTICLE I

DEFINITIONS

1.1     Definitions.  The following words and phrases when used herein shall have the following meanings, except as otherwise required by the context:

"Beneficiary" means a person designated as a beneficiary of a Participant by the Participant, or the terms of a Program, and who is or may become entitled to a benefit under a Program.

"Committee" means the Committee established to administer the Trust pursuant to Article VII hereof.

"Committee Chair" means the chairperson of the Committee as described in Section 7.1 hereof.

"GM Portion" means that part of the Trust Fund, at the time the Settlement Agreement terminates, equal to the GM portion as determined pursuant to Section 14.E.1 of the Settlement Agreement.

**"Investment Manager"** means a person or entity who is either:

(1)    an investment adviser registered as such under the Investment Advisers Act of 1940; or

(2)    a bank, as defined in that Act; or

(3)    an insurance company qualified to manage, acquire, or dispose of any asset of an employee benefit plan under the laws of more than one State.

**"Participants"** shall mean those Class Members and Future Retirees who may receive Program Benefits.

**"Program Account"** means that part of the assets of the Trust attributable to a particular Program, including contributions, income, gains or losses, and expense allocable to that Program and insurance contracts, if any, used as vehicles to pay benefits under the Program.

**"Program Benefit"** means:

(a)  While the Settlement Agreement is in effect, the benefits described in Section 14.A of the Settlement Agreement, as adjusted by the Committee pursuant hereto.

(b)  After the Settlement Agreement terminates,

(i)  with respect to the GM Portion, any benefits payable, or which constitute reimbursement for providing for benefits, to Class Members and Future Retirees under the Original Plan, Current Plan, Modified Plan, or Catastrophic Plan if and to the extent directed by GM.

(ii)  with respect to the UAW Portion, any medical or health benefit, or dental benefit, as determined by the Committee, for Participants.

**"Programs"** shall mean the plans that provide for Program Benefits.

**"Public Class"** means the Committee class as described in Section 7.1.

"Settlement Agreement" means the Settlement Agreement attached as Attachment __ hereto.

"Trust Fund" means the assets held by the Trustee in the Trust under the provisions of this Trust Agreement.

"Trust Year" means the fiscal year beginning on each January lst and ending on the following December 31st; provided that the first Trust Year shall begin on the effective date specified by Section 13.10 hereof and shall end on the following December 31st.

"UAW Class" means the Committee class made up of members who are chosen by UAW in accordance with the terms of Section 7.1 hereof.

"UAW Portion" means that part of the Trust Fund, at the time the Settlement Agreement terminates, other than the GM Portion.

       1.2       <u>Gender and Number</u>.  Masculine pronouns shall refer both to males and to females.  Singular or plural words shall be construed to refer to the plural or the singular, respectively, where appropriate.

       1.3 <u>Participants and Beneficiaries</u>.  All references to Participants herein shall be deemed to include a reference to the Beneficiaries of such Participants.

ARTICLE II

PAYMENTS TO AND FROM THE TRUST

       2.1       <u>Payments to the Trust</u>.  The Company shall make, or cause to be made, payments to the Trust at the times and in accordance with the terms set forth in the Settlement Agreement.  The Trustee shall receive any payments made to it in cash or in the form of such other property as it may from time to time deem acceptable and which shall have been delivered to it.  All payments so received, together with the income therefrom and any other increments thereon, shall be held, invested, reinvested, and administered by the Trustee pursuant to the terms of this Trust Agreement, without distinction between principal and income.  The Trustee shall not be responsible for the calculation or collection of any contribution under, or required by, the Settlement Agreement, but shall be responsible only for cash or other property received by it pursuant to this Trust Agreement.  The Committee shall have the enforcement power set forth in the Settlement Agreement to require the Company to make or cause to be made contributions to the Trust in accordance with the terms of the Settlement Agreement.

       2.2       <u>Payments from the Trust</u>.  The Trustee shall, from time to time and at the written direction of the Committee, make, directly or indirectly, cash payments out of the Trust Fund, other than Program Benefit payments.  With respect to Program Benefit payments, the Trustee shall, from time to time and at the written direction of the Committee (before the termination of the Settlement Agreement and after the termination of the Settlement Agreement with respect to the UAW Portion) or the Company (after the termination of the Settlement Agreement with respect to the GM Portion), as the case may be, pursuant to Section 8.7 hereof, make, directly or indirectly, cash Program Benefit payments out of the Trust Fund in such amounts, to such persons, and for such purposes as may be specified in the written directions of the Committee or the Company, as the case may be.  After the Settlement Agreement terminates, Program Benefit payments directed by the Company shall be charged against the GM Portion of the Trust Fund and those payments directed by the Committee shall be charged against the UAW Portion of the Trust Fund.  To the extent permitted by law, the Trustee shall be under no liability for any payment made pursuant to the written direction of the Committee or the Company or for any payment not made in the absence of a written direction of the Committee or the Company.  Any written direction of the Committee or the Company shall constitute a certification that the payment so directed is one that the Committee or the Company is authorized to direct.  If a dispute arises with respect to a payment, the Trustee may withhold or cause to be withheld such payment until the dispute has been resolved.

33

      2.3      <u>Cooperation of the Company</u>.   The Company will cooperate with the Committee as set forth in the Settlement Agreement.

      2.4      <u>Incorporation of Sections 14. E. of the Settlement Agreement</u>.  Section 14.E. of the Settlement Agreement is incorporated by reference in this Trust agreement as if fully set forth herein.

ARTICLE III

ADMINISTRATION OF ACCOUNTS

      3.1      <u>Separate Accounts</u>.  The Committee shall have the right, but not the obligation, to direct the Trustee to allocate the assets among the Programs, for accounting purposes, and to establish a separate Program Account for each Program.  In addition, the Committee may direct the Trustee in writing to account separately for such funds as the Committee shall designate in writing, and if so directed, the Trustee shall establish separate accounts or sub-accounts for such funds.  The funds allocated to such accounts and sub-accounts (including Program Accounts) may be commingled for investment purposes.  The Committee may also direct the Trustee to eliminate one or more Program Accounts and transfer funds between Program Accounts.  The Committee shall designate to the Trustee in writing the account or sub-account to which each payment to and from the Trust is allocable.

ARTICLE IV

INVESTMENT AUTHORITY

      4.1      <u>Trustee's Authority</u>.

(a) The Trustee shall have and exercise the following powers and authority (i) over that portion of the Trust Fund where it has been delegated express investment management authority as provided in Section 8.3, or (ii) upon direction of the Investment Manager or the Committee, as the case may be, for all other assets in the Trust Fund: to invest and reinvest the principal and income of the Trust Fund and keep the Trust Fund invested, as a single fund without distinction between principal and income, in such securities or in such property, real or personal, tangible or intangible, as the Trustee shall deem advisable, including but not limited to cash or cash equivalents, capital or common stocks (whether voting or nonvoting and whether or not currently paying a dividend), preferred stocks (whether voting or nonvoting and whether or not currently paying a dividend), bonds, notes, debentures, interests in investment companies, trusts, partnerships, and other pooled funds, savings bank deposits (including but not limited to savings accounts and savings investment media that are maintained by the Trustee's own banking department), and commercial paper, and in such other property, investments, futures, derivatives and securities, whether domestic or foreign, of any kind, class, or character as the Committee may deem suitable for the Trust Fund, and such investment and reinvestment shall

34

not be restricted to properties and securities authorized for investment by trustees under any present or future law; provided that in no event shall the Trustee make any investment prohibited by ERISA.

Notwithstanding the foregoing, (a) the Trust Fund shall not directly or indirectly invest in or use derivatives or futures contracts, except in a collective investment vehicle that does not employ derivatives or futures contracts as a principal part of its investment strategy; (b) the Trust Fund shall not invest in the securities of a company whose principal operations are located outside the United States, except indirectly through a collective investment vehicle or as part of a passively-managed, index or model-driven strategy, provided that such collective investment vehicle or strategy does not invest in such securities as a principal part of its investment strategy; and (c) the Trust Fund shall not invest in investment funds exempt from registration under the Investment Company Act of 1940 by reason of 3(c)(1) or (3)(c)(7) that utilize leverage or long-short strategies.

(b) Except as otherwise provided by Article VIII hereof, all rights associated with assets of the Trust shall be exercised by the Trustee; all such rights shall in no event be exercisable by or rest with Participants.

## ARTICLE V

## POWERS AND DUTIES OF THE TRUSTEE

5.1    Powers.  The Trustee shall have and exercise the following powers (i) over that portion of the Trust Fund where it has been delegated express investment management authority as provided in Section 8.3, or (ii) upon direction of the Investment Manager or the Committee, as the case may be, for all other assets in the Trust Fund:

(a) to sell, exchange, convey, transfer, or otherwise dispose of any property held by it, by private contract or at public auction; and no person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition;

(b) to make commitments either alone or in company with others to purchase at any future date any property, investments, or securities set forth in Section 4.1 hereof;

(c) to retain, manage, operate, repair, develop, preserve, improve, mortgage, or lease for any period any real property held by the Trustee upon such terms and conditions as the Trustee deems proper, either alone or by joining with others using other Trust assets for any such purposes if by it deemed advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease, including the waiver of rentals, if, by it deemed advisable; and to make provisions for the amortization of the investment or in depreciation of the value of such property as it may deem advisable;

**(d)** to organize corporations under the laws of any State for the purpose of acquiring or holding title to any property for the Trust Fund or to request the Committee to appoint another trustee for such purpose;

**(e)** to retain any stocks or other property received as a result of the exercise of any of the powers herein granted, whether or not investment in such stocks or other property is authorized by Section 4.1 hereof;

**(f)** to vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to exercise any conversion privileges, subscription rights, or other options, and to make any payments incidental thereto; to consent to or otherwise participate in corporate reorganizations or other changes affecting corporate securities and to delegate discretionary powers and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to stocks, bonds, securities, or other property held in the Trust Fund;

**(g)** to make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

**(h)** to register any investment held in the Trust Fund in its own name or in the name of a nominee and to hold any investment in bearer form, to utilize the services of a depository clearing corporation (such as the Depository Trust Company) to the extent permitted by law, and to combine certificates representing such investments with certificates of the same issue held by the Trustee in other fiduciary capacities under employee benefit plans, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust;

**(i)** to employ suitable agents and counsel and to pay reasonable expenses and compensation thereto;

**(j)** to borrow money on such terms and conditions as the Trustee in its discretion may deem advisable;

**(k)** to transfer monies of the Trust Fund to a common or collective trust fund or pooled investment fund; money and other assets of the Trust Fund invested in such a fund shall be held and administered by the trustee thereof strictly in accordance with the terms of, and under the powers governing, such fund to the extent consistent with this Trust Agreement and the terms of the Programs funded hereunder; the combining of money and other assets of this Trust with money and other assets of such a fund is hereby specifically authorized;

**(l)** to compromise or otherwise adjust all claims in favor of or against the Trust Fund;

**(m)** to compromise, compound, and settle any debt or obligations upon such terms as the Trustee may deem advisable and to agree to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon, default, or otherwise enforce any such obligation;

(n) upon receipt of written direction from the Committee, to use monies in the Trust Fund to purchase or maintain insurance or annuity contracts;

(o) to enter into custody arrangements with third parties reasonably acceptable to the Trustee and transfer assets from the Trust Fund to the custody of that third party; and

(p) to do any and all acts with respect to the assets held in the Trust Fund that an owner of any asset held by the Trust Fund could perform.

       5.2     **Dealing with Trustee**. In no event shall any purchaser, vendor, or other person dealing with the Trustee be required to ascertain the authority and power of the Trustee to make any sale, transfer, assignment, or investment of the whole or any part of the Trust Fund at any time held hereunder, or to make any contract in relation thereto, nor shall any insurance company be required to ascertain the power or authority of the Trustee to apply for and purchase any insurance or annuity contract, and any such person or company may rely upon any factual information furnished by the Trustee in connection therewith. All parties dealing with the Trustee with respect to the Trust Fund shall have the right to assume that the Trustee has full power and authority in all respects to deal with the Trust Fund and shall not be affected by any notice to the contrary, and no purchaser shall be required to see to the application of the purchase money.

       5.3     **Fees and Expenses**. The Trustee shall be paid such reasonable compensation as may be agreed upon in writing from time to time between the Trustee and the Committee. Such compensation and all fees and expenses incurred by the Trustee in the proper performance of its duties, including fees for legal services rendered to the Trustee and compensation paid to any Investment Manager, shall be paid from the Trust Fund. All taxes of any kind that may be levied or assessed under existing or future laws upon, or with respect to, the Trust shall be paid from the Trust Fund.

       5.4     **Administration**. The Trustee shall not be responsible in any way for the administration of the Programs.

       5.5     **Consultation and Indemnification**. The Trustee may consult with counsel, and the Trustee shall not be deemed imprudent by reason of taking or refraining from taking any action in accordance with the opinion of counsel. The Trust shall indemnify and hold the Trustee harmless from and against any liability that the Trustee may incur in the administration of the Trust Fund, unless such liability arises from the Trustee's negligence or breach of the provisions of this Trust Agreement or ERISA. The Trustee shall not be required to give any bond or any other security for the faithful performance of its duties under this Trust Agreement, except such as may be required by law.

       5.6     **Responsibilities**. Except as required by ERISA, the Trustee shall be under no duty (i) to take any action other than as herein specified with respect to the Trust unless the Committee or an Investment Manager shall furnish the Trustee with instructions in

proper form as described by Section 5.8 hereof or (ii) to engage in any suit with respect to the Trust unless the Trustee shall have first agreed in writing to do so and shall have been fully indemnified to the satisfaction of the Trustee.  To the extent not prohibited by ERISA, the Trustee shall not be responsible or liable in any way for any action or omission of the Company or the Committee with respect to the performance of their duties and obligations as set forth in the Programs and this Trust Agreement or the Company with respect to the performance of its duties and obligations as set forth in the Programs; provided that the Trustee shall not be relieved of responsibility or liability for any responsibility, obligation, or duty imposed upon it under this Trust Agreement or under ERISA or as a result of its negligence.  The Trustee is a party to this Trust Agreement solely for the purpose set forth in this Trust Agreement and to perform the acts set forth herein, and no obligation or duty shall be imposed upon it except as expressly stated herein or as required by ERISA.

    5.7    **Direction**.  The Trustee may request the advice or direction of the Committee with respect to the administration of the Trust and the distribution of the Trust Fund, and, to the extent permitted by ERISA, shall be protected from liability in relying upon any direction given to it by the Committee, in writing, in response to such a request.

    5.8    **Reliance on Written Instructions**.  The Trustee shall be entitled to rely upon any written notice, instruction, direction, certificate, or other communication believed by it to be genuine and to be signed by the Committee, an Investment Manager, the Company, or their authorized agent(s) or representative(s), unless it knows or should know that the direction or instruction constitutes a breach of the Committee's or the Investment Manager's fiduciary responsibility with respect to the Trust.  The Trustee shall be fully protected by the assets of the Trust in making payments out of the Trust Fund, or in taking or omitting to take any other actions, in accordance with the written instructions of the Committee, an Investment Manager, the Company or their authorized agent(s) or representative(s), and shall have no responsibility to see to the application of any such payments by the Participants or legal representatives, or by any other recipients thereof specified in such instructions, or to ascertain whether such instructions comply with the terms of the Programs, or to determine the rights or benefits of any person in the Trust or under the Programs, and shall not be liable to any person for or in respect of any payment made by it, or action taken or omitted to be taken by it, in good faith without notice or knowledge of a change in the condition or status of any person affecting that person's rights hereunder; provided that if the Trustee knows or should know that such an instruction constitutes a breach of fiduciary responsibility with respect to the Programs, the Trustee shall inform the Committee of the breach.  The Committee, the Company and any Investment Manager(s) shall furnish the Trustee with a list naming their authorized agent(s) or representative(s), and describing the scope of the authority granted, and shall notify the Trustee of any changes to the list.  Absent such notification, the Trustee may assume no change has occurred with respect to each list.

### ARTICLE VI

**FUNDING POLICY AND INVESTMENT OBJECTIVES**

      6.1      **Communication to Trustee**. The Committee shall inform the Trustee in writing of the investment objectives of the Trust and of any changes or modifications therein. Until the Committee informs the Trustee in writing of any change in the investment objectives of the Trust, the Trustee may assume that there has been no change in the investment objectives.

**ARTICLE VII**

**THE COMMITTEE**

      7.1      **Committee Composition.**

(a) The Committee shall be comprised of seven (7) individual persons, consisting of two classes, the UAW Class with three (3) members and the Public Class with four (4) members. One of the members of the Public Class shall serve as the Committee Chair. No member of the Committee shall be an affiliate of the Company, including a current or former officer, director or salaried employee of the Company. No member of the Public Class shall be an active employee or retiree of the UAW nor shall any member of the Public Class have any financial or institutional relationship with the Company or the Committee that the Committee, in its sole discretion, determines to be material. The initial members of the Public Class and the initial Committee Chair are listed on Attachment 1 to this Trust Agreement.

(b) The members of the UAW Class shall serve at the discretion of the UAW, and may be removed or replaced, and a successor designated, at any time by written notice from the President of the UAW to the members of the Committee. The members of the Public Class shall serve for terms of four (4) years, except the initial members shall serve for terms that expire as set forth in Attachment 1. In the event of a vacancy in the Public Class, whether by expiration of a term, resignation, removal, incapacity, death or otherwise of a Public Class member, the Public Class shall elect a new member of the Public Class by majority vote of the continuing Public Class members, excluding such member vacating his or her seat. In selecting replacement Public Class Members, the remaining Public Class Members will prudently select such replacements, taking into account ethnic, racial and gender diversity to the extent permitted under applicable law. A Public Class member can be removed by an affirmative vote of any five (5) other members of the Committee at any time. The Committee Chair shall serve for a term of two (2) years. There shall be no limit on the number of terms a member of the Public Class may serve or a Committee Chair may serve. The Committee Chair may be removed and any successor Committee Chair shall be elected by a majority vote of the Committee as a whole then in office.

      7.2      **Action by Committee.**

(a) The Committee shall establish rules from time to time for the transaction of its business. The members of the Committee may appoint from their number such committees with such powers as they shall determine, authorize one or more of their number or any agent to execute or deliver

any instrument or make any payment on behalf of the Committee and may, at the expense of the Trust, retain counsel, employ agents and independent contractors and obtain clerical, medical, actuarial and accounting services as the Committee may require or deem advisable from time to time.  In addition, the Committee may delegate certain ministerial administrative functions to one or more persons or institutions pursuant to a written agreement.

(b) The Committee shall hold meetings upon notice, at such place or places, and at such time or times as it may from time to time determine.  Meetings will normally be held in Detroit, Michigan.  A majority of the members of the Committee shall constitute a quorum for the transaction of business at any meeting of the Committee.  All action by the Committee shall be taken at a meeting of the Committee and members may be permitted to participate by teleconference.  The vote of a majority of the members present at the time of the vote, if a quorum is present at such time, shall be the act of the Committee.  Any action required or permitted to be taken at any meeting of the Committee may be taken without a meeting, by the unanimous written consent of all the members of the Committee.  The UAW Class will have three (3) votes and the Public Class will have four (4) votes, split evenly among the members of each such Class who are participating in the meeting.

       7.3    <u>Fees and Expenses</u>.  Members of the Committee will be entitled to reasonable compensation for the performance of their duties hereunder.  Members of the Committee may be reimbursed for reasonable expenses properly and actually incurred in the performance of their duties.  The fees and expenses of the Committee shall be deemed to be fees and expenses of the Trust and shall be reimbursed from the Trust Fund.

(a) Members of the Public Class shall receive an annual retainer of $16,000, payable in equal quarterly installments in arrears, and a meeting fee of $2,000 for each meeting of the Committee in which such member of the Public Class participates; <u>provided</u>, <u>however</u> that the combination of retainer and meeting fees shall not exceed $28,000 per calendar year.  In addition to the retainer and fees described in the preceding sentence, the Committee Chair shall receive an additional $5,000 fee per year, payable in quarterly installments in arrears, and such combination of retainer and fees for the Committee Chair shall not exceed $33,000 per calendar year.  A conference call to discuss ad hoc issues that may come before the Committee shall not constitute a meeting for purposes of granting a meeting fee.

(b) Members of the UAW Class who are eligible to receive compensation for participation on the Committee may receive up to the amounts described in Subsection 7.3(a) above for members of the Public Class, or a lower amount as set by the full Committee (excluding such UAW Class member whose compensation is at issue).  Any Committee member who is an active employee of the UAW shall not be eligible to receive compensation for service as a Committee member.  In the event there is more than one UAW Class member eligible to receive compensation for service as a Committee member, each such UAW Class member shall receive the same amount as any other such eligible UAW Class member.

(c) Nothing herein shall prohibit or limit any member of the Committee from receiving fees for services rendered at the request of the Committee (*e.g.*, reasonable meeting fees paid for attendance at retiree meetings to explain the operation of the programs contemplated by the Settlement Agreement, and/or this Trust Agreement).

(d) The fees and limits described in Subsections 7.3(a) and (b) above shall be increased by 3%, compounded annually, with the first increase to occur January 1, 2007.

7.4     Consultation and Indemnification.  The Committee may consult with counsel, and the Committee shall not be deemed imprudent by reason of taking or refraining from taking any action in accordance with the opinion of counsel.  The Trust shall indemnify and hold the Committee harmless from and against any liability that the Committee may incur in connection with its duties hereunder, unless such liability arises from the Committee's negligence or breach of the provisions of this Trust Agreement or ERISA; provided that nothing in this Section 7.4 shall require any payment from any source other than the Trust or require any payment to be made to the Trust.  The Committee shall not be required to give any bond or any other security for the faithful performance of its duties under this Trust Agreement, except such as may be required by law.

7.5     Interpretation by Committee.  The Committee shall be responsible for the administration, operation and interpretation of this Trust Agreement.  Except in regard to matters affecting any rights or responsibilities of the Company, including but not limited to the matters provided in Section 2.4 of this Trust Agreement, the Committee shall have the exclusive right to interpret the Trust Agreement and to exercise discretion where necessary or appropriate in the interpretation and administration of the Trust Agreement, including making certain findings of fact, and to decide any and all matters arising hereunder or in connection with the administration of the Trust Agreement. Such decisions, actions and records of the Committee shall be conclusive and binding upon all persons, other than the Company, having or claiming to have any right or interest in or under the Trust.

7.6     Reliance on the Company.  The Committee shall be entitled to rely upon any written notice, instruction, direction, certificate, or other communication believed by it to be genuine and to be signed by the Company or its authorized agent(s) or representative(s) with respect to the determination of whether someone is a covered Class Member or Future Retiree (or General Retiree, Protected Retiree or Non-Participating Retiree), eligible for a particular benefit and the amount of any such benefit, or any other matters respecting the benefits provided by the Settlement Agreement.  The Company shall furnish the Committee with a list naming its authorized agent(s) or representative(s), and describing the scope of the authority granted, and shall notify the Committee of any changes to the list.  Absent such notification, the Committee may assume no change has occurred with respect to each list.

ARTICLE VIII
DUTIES OF THE COMMITTEE

8.1     **Information.**  The Committee shall furnish the Trustee with such information and data relating to the Programs as are necessary for the Trustee to carry out its duties under this Trust Agreement.

8.2     **Investment Responsibility.**  The Committee shall direct the investment of the assets in the Trust Fund except and to the extent that it has vested such authority in the Trustee pursuant to Section 8.3 or has appointed an Investment Manager pursuant to Section 8.4 hereof.

8.3     **Trustee Authority.**  The Committee may, with the written consent of the Trustee, confer authority in the Trustee to determine the investment or reinvestment of all or any portion of the Trust Fund.

8.4     **Appointment of Investment Manager.**  The Committee may appoint one or more Investment Managers for the purpose of directing the Trustee with respect to the investment or reinvestment of all or any portion of the Trust Fund.  The Committee shall prudently select and retain any such Investment Manager, taking into account management fees and other transaction costs, along with other appropriate considerations.  The Committee shall certify to the Trustee the appointment and scope of authority of, and any resignation or removal or change in authority of, any Investment Manager appointed by it under this Section 8.4, the appointment of any successor thereto, and the identity of the individual or individuals entitled to act on behalf of the Investment Manager.  In particular, the Committee shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification.  To the extent permitted by ERISA, the Trustee shall be fully protected by the assets of the Trust in relying on each such certification until it receives notice of any change or revocation thereof.  An Investment Manager shall present evidence to the Trustee of its qualifications as an Investment Manager under Section 3(38) of ERISA, and shall acknowledge in writing its appointment as a fiduciary of the Trust Fund.

8.5     **Responsibility of Investment Manager.**  An Investment Manager shall have sole investment responsibility for that portion of the assets of the Trust Fund that it has been appointed to manage.  An Investment Manager that has been thus granted such responsibility shall have all the investment powers enumerated in Article IV hereof that shall be granted to it by the Committee.  Where such an Investment Manager has been appointed by the Committee, the Trustee shall have no duty to review or recommend any investment or reinvestment of the Trust Fund by or at the direction of such Investment Manager, nor shall the Trustee be charged with the duties imposed by Section 9.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to any Investment Manager.  Except to the extent provided by ERISA or under other applicable law, the Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this Section. The Trustee shall be under no duty to question the direction or lack of direction of any

Investment Manager, but shall act, and shall be fully protected by the assets of the Trust in acting, in accordance with each such direction.

       **8.6**     **Segregated Fund.**  The Committee may, but is not obligated to, create a segregated fund by certifying to the Trustee in writing that it has established a segregated fund in accordance with procedures that are consistent with Section 403(a)(1) of ERISA, the investment and control of the assets of which are to be the sole and exclusive responsibility of the Committee.  The Committee shall have complete discretionary authority to direct the Trustee with respect to the investment and reinvestment of the portion of the Trust Fund constituting the segregated fund, as specified by the Committee, without any requirement that any other fiduciary be consulted prior to the giving of any such directions to the Trustee or the carrying out of such directions by the Trustee.  If the Committee has thus assumed such discretionary authority, the Committee shall have all the investment powers enumerated in Article IV hereof.  The Committee shall certify to the Trustee the scope of its authority, any change in the authority of the Committee, and the identity of the individual or individuals entitled to act on behalf of the Committee.  In particular, the Committee shall state and certify how investment authority is to be divided with respect to assets, classes of assets, or separate investment funds specified and defined in such certification.  To the extent permitted by ERISA, the Trustee shall be fully protected by the assets of the Trust in relying on each such certification until it receives notice of any change or revocation thereof, and the Trustee shall not be liable or responsible for any loss resulting to the Trust Fund by reason of any investment or reinvestment or any noninvestment pursuant to the provisions of this Section.  The Trustee shall have no duty to review or to recommend any investment or reinvestment of the segregated fund, nor shall the Trustee be charged with the duties imposed by Section 9.1 hereof to the extent of any such grant of discretionary authority for the investment or reinvestment of the Trust Fund to the Committee.  The Trustee shall have no discretionary authority over a segregated fund, but shall be subject, with respect to the segregated fund, to all proper directions of the Committee that are not contrary to the terms of ERISA.

       **8.7**     **Allocation of Trust Fund Assets.**

(a) **Prior to December 31, 2011 while the Settlement Agreement is in effect, Program Benefits shall be the amounts necessary to accomplish Mitigation to the dollar amounts as described in Subsections 14.A(i), (ii) and (iii) of the Settlement Agreement, adjusted in the same manner as the Company adjusts the Indexed Amounts in accordance with Section 5.B of the Settlement Agreement, and dental benefits as provided for in Section 14.A of the Settlement Agreement.**

(b) **During the period on and after December 31, 2011 while the Settlement Agreement is in effect, the Committee shall have the authority to reset the Program Benefits, from time to time.  On each reset date, the Committee, in its absolute discretion, shall endeavor to set the Program Benefits equitably and such that the Trust Fund will be sustainable as the Committee in its sole discretion determines, over the twenty (20) year period following such reset date.**

(c) **After the Settlement Agreement terminates, the Committee shall provide Program Benefits in its absolute discretion, as it deems equitable. The Committee shall have no power to direct the payment of benefits pursuant to (b)(i) of the definition of "Program Benefits" or to direct the application of the GM Portion of the Trust Fund after the Settlement Agreement terminates.**

## ARTICLE IX

## FIDUCIARY OBLIGATIONS

**9.1     Standard of Fiduciary Conduct.   The Trustee shall discharge its duties solely in the interest of the Participants and**

(a) **for the exclusive purpose of providing benefits to Participants and defraying reasonable expenses of administering the Programs (including any such expenses incurred by the Committee);**

(b) **with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;**

(c) **by diversifying the investments of the Trust Fund so as to minimize the risk of large losses unless under the circumstances it is clearly prudent not to do so; and**

(d) **in accordance with this Trust Agreement, except to the extent that this Trust Agreement may be inconsistent with ERISA.**

**9.2     Prohibited Inurement.   None of the assets of the Trust shall inure to the benefit of the Company or the UAW, any affiliate of the Company or the UAW, or any other person except through the payment of benefits provided under the Programs (including the payment of reasonable Program administration expenses and taxes) or by reimbursing the Company, providers, carriers or administrators for costs incurred in providing health care benefits to Participants, or by reimbursing the Company, providers, carriers or administrators for providing directly or indirectly for dental coverage to Participants.**

**9.3     Scope of Responsibility.   A fiduciary not charged with a specific responsibility under the provisions of the Programs or this Trust Agreement shall be under no duty to question any action or lack of action of another fiduciary with respect to such responsibility, and shall not be liable for a breach of fiduciary responsibility by another fiduciary, unless the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary knowing such act is a breach, or if, having knowledge of a breach by such other fiduciary, the fiduciary fails to make reasonable efforts under the circumstances to remedy the breach.**

**9.4     Company Not a Fiduciary.   The Company is not a fiduciary with respect**

to the Trust.  In addition, (1) neither the "Trustee, the Committee nor any person or entity related to the Defined Contribution Plan, DC VEBA or this Trust Agreement has any authority to bind the Company, either directly, or indirectly through any interpretations, findings of fact or conclusions regarding the Defined Contribution Plan, the DC VEBA and this Trust Agreement, without the Company's specific written consent, (2) the Company is not a fiduciary with respect to this Trust Agreement, (3) the Company does not exercise any discretionary authority or discretionary control with respect to the management of this Trust Agreement, or exercise any authority or control with respect to the management or disposition of assets governed by this Trust Agreement, (4) the Company does not render investment advice for a fee or other compensation, direct or indirect, with respect to any assets governed by this Trust Agreement, and does not have the authority or responsibility to do so, and (5) the Company has no discretionary authority or discretionary responsibility in the administration of this Trust Agreement, except in connection with the payment of Program Benefits with respect to the GM Portion after the Settlement Agreement terminates.

## ARTICLE X

## ACCOUNTING AND TAXES

      **10.1**    <u>Accounting for Trust Fund</u>.  The Trustee shall keep timely, accurate, and detailed accounts of all investments, receipts, disbursements, and other transactions hereunder, and all accounts, books, and records relating hereto shall be open to inspection and audit at all reasonable times by the Committee and any other person designated by the Committee.  Within sixty (60) days following the close of each Trust Year, within sixty (60) days after the removal or resignation of the Trustee, and at such other times as the Committee reasonably may require, the Trustee shall file with the Committee a written account setting forth all investments, receipts, disbursements, and other transactions effected by the Trustee during such Trust Year or since the date of its last account.  The Trustee, within the same time periods, shall ascertain and certify to the Committee, in accordance with applicable U.S. Department of Labor regulations, the cost and fair market values as of the close of such Trust Year (or such other period as the Committee may require) of all securities and other properties held in the Trust Fund.  Such fair market values shall be determined either by the Trustee itself or by such person or persons believed by the Trustee to be competent to make such determination as the Trustee may select, but in accordance with a method consistently followed and uniformly applied.  The Trustee, within the same time periods, also shall furnish to the Committee a balance sheet containing a description in reasonable detail of all assets and liabilities of the Trust.  In the event any portion of the Trust Fund has been transferred to a common or collective trust fund pursuant to Section 5.1 hereof, such account shall include a copy of the latest annual written account of the common or collective trust fund.  The Committee shall have the right to require an audit by certified public accountants of the records and assets of the Trust.  The expenses and any special fee charged by the Trustee for any such audit shall be paid pursuant to the provisions of Section 5.3 hereof.

      **10.2**    The Trustee shall pay out of the Trust Fund all real and personal

property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws against the Trust Fund.

   10.3  The Company and the UAW will cooperate in obtaining a determination by the Internal Revenue Service (the "IRS") that the Trust constitutes a voluntary employees' beneficiary association within the meaning of Section 501(c)(9) of the Code. If the DC VEBA does not qualify for tax-exempt status, the parties will make best efforts to immediately amend or modify the DC VEBA to qualify the Trust under Section 501(c)(9) of the Code. If the Trust still does not qualify, the entire assets of the Trust attributable to the contributions of the Company shall be returned by the Trustee to the Company for the purpose of reimbursing the Company for providing qualifying welfare benefits to the Class Members and Future Retirees within thirty (30) days of notification by the Company that the Commissioner ruled that the Trust is not qualified under Section 501(c)(9) of the Code; <u>provided</u>, <u>however</u>, that in such case the Company shall be required to make a contribution in an amount equal to the assets that have been returned to another trust or benefit plan funding vehicle that effectively achieves an identical purpose of providing benefits for Class Members as contemplated hereunder and is qualified under Section 501(c)(9) of the Code.

ARTICLE XI

RESIGNATION, REMOVAL, AND SUCCESSION OF TRUSTEE

   11.1  <u>Resignation</u>. The Trustee may resign at any time by giving sixty (60) days' notice in writing to the Committee.

   11.2  <u>Removal</u>. The Committee may remove the Trustee at any time by giving thirty (30) days' notice in writing to the Trustee.

   11.3  <u>Successor Trustee</u>. In no event shall the resignation or removal of the Trustee terminate this Trust Agreement, but upon such resignation or removal of the Trustee, the Committee shall have the duty forthwith of appointing a successor trustee, who shall have the same powers and duties conferred upon the Trustee hereunder. In the event of such resignation or removal of such Trustee and upon the appointment of a successor trustee and acceptance of such Trustee, the Trustee shall turn over to the successor trustee the Trust Fund and all records of books of account and other documents pertaining to this Trust Agreement that are in its possession, reserving such sums as the Trustee shall reasonably deem necessary to defray its expenses in settling its accounts, to pay any of its compensation due and unpaid, and to discharge any obligation of the Trust Fund for which the Trustee may be liable; and if the sums so reserved are not sufficient for these purposes, the Trustee shall be entitled to recover the amount of any deficiency from the successor trustee. To the extent permitted by ERISA, after the Trust Fund has been properly transferred and delivered to the successor trustee, the Trustee shall be released and discharged from all further accountability or liability for the Trust Fund and shall not be responsible in any way for the further disposition of the Trust Fund or

46

any part thereof.

**11.4** **Waiver of Notice**. In the event of any resignation or removal of the Trustee, the Trustee and the Committee may in writing waive any notice of resignation or removal as may be provided hereunder.

ARTICLE XII

AMENDMENT AND TERMINATION OF AGREEMENT

**12.1** **Amendment**. This Trust Agreement may be amended in writing at any time or from time to time, in whole or in part, by action of the Committee, and any such amendment may be retroactive. However, in no event shall the Committee be permitted to amend the restrictions on investments as described in the second paragraph of Subsection 4.1(a); Committee composition, action and fees as described in Sections 7.1, 7.2 and 7.3, respectively; or the allocation of the Trust Fund assets as described in Section 8.7. There shall be no amendment that affects the rights, duties, or responsibilities of the Trustee shall become effective without the Trustee's written consent. No amendment shall be inconsistent with the requirements of ERISA, Section 501(c)(9) of the Code, or with the provisions of the Settlement Agreement. No amendment shall authorize or permit any assets of the Trust to be used for, or diverted to, purposes other than for the exclusive benefit of Participants of the Programs, or for reimbursing for the costs of providing health care benefits to Class Members and Future Retirees and the payment of reasonable administration expenses related to providing health care benefits to Class Members and Future Retirees prior to the satisfaction of all liabilities under the Programs. No amendment shall cause or permit any portion of the Trust Fund to revert to or become the property of the Company or the UAW. No amendment may alter the requirements provided for in Section 2.4 of this Trust Agreement or increase any responsibility or decrease any right of the Company without the Company's express written consent. The Company shall have no right to amend this Trust Agreement at any time.

**12.2** **Termination**. The Company shall have no right to terminate this Trust Agreement at any time.

ARTICLE XIII

MISCELLANEOUS

**13.1** **Limited Effect of Program and Trust**. Neither the establishment of the Programs nor the Trust nor any modification thereof, nor the creation of any fund or account, nor the payment of any amounts from the trust, shall be construed as giving to any Participant any legal or equitable right against the Trustee, the Company, the Committee, the UAW, or any affiliate, director, officer, employee, agent, or representative thereof, except as may otherwise be expressly provided in the Programs or the Settlement Agreement and except as may

otherwise be provided by ERISA.  Under no circumstances shall the terms of employment of any employee be modified or in any way affected by the Trust or this Trust Agreement.

13.2     **Nonalienation of Benefits**.  Except as otherwise required by law, neither the benefits payable from the Trust Fund nor any Participant's interest in any of the assets of the Trust shall be subject to any manner of anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind, either voluntary or involuntary, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, garnish, execute, levy upon, or otherwise dispose of any right to benefits payable under, or any interest in, the Trust Fund shall be void.  Neither the Trust Fund nor the Trustee shall in any manner be liable for, or be subject to, the debts, contracts, liabilities, engagements, or torts of any person entitled to benefits from the Programs.

13.3     **Governing Law**.  This Trust Agreement shall be administered, construed, and enforced according to the laws of the State of [Michigan], except to the extent superseded by ERISA or any other federal law.

13.4     **Severability**.  Any provision of this Trust Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction, and any such provision, to the extent invalid or unenforceable, shall be replaced to the extent permissible by a valid and enforceable provision preserving the same effect.

13.5     **Binding Effect**.  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Company and its successors, the Trustee and its successors in Trust, and the Participants, and their respective heirs, personal representatives, successors and assigns, in accordance with and subject to the terms hereof.

13.6     **Number of Originals**.  This Trust Agreement maybe executed in any number of counterparts, each of which shall be deemed an original, and the counterparts shall constitute one and the same instrument, which shall be sufficiently evidenced by any one thereof.

13.7     **Headings**.  Heading and subheadings in this Trust Agreement are inserted for convenience of reference only and are not to be considered in the construction of its provisions.

13.8     **Fiduciary Duties**.  Nothing in this Trust Agreement shall relieve or be deemed to relieve the Trustee or any other fiduciary from any responsibility or liability for any responsibility, obligation, or duty imposed by or under ERISA.

13.9     **Evidence of Authority**.  The execution by the Trustee of any instrument, document, or paper in connection with the exercise of any of the powers enumerated herein

shall, of itself, be conclusive evidence to all persons of the authority of the Trustee to execute the same and to exercise all powers incident thereto.

        13.10     **Necessary Parties to Dispute**.  Necessary parties for any accounting, litigation or any other proceedings, other than those related to Section 2.4 of this Trust Agreement or any rights or responsibilities of the Company, shall include only the Trustee and the Committee, and the settlement or judgment in any such case in which the Trustee and the Committee are duly served or cited shall be binding upon all Participants and upon all persons claiming by, through or under them.

        13.11     **Effective Date**.  This Trust Agreement shall be effective as of the Effective Date.

        IN WITNESS WHEREOF, this Trust Agreement has been executed this _____ day of _____, _____.

        **General Motors Corporation**

        **By:**

        _____

        _____

**Attest:**

_____

        _____, as Trustee for the **General Motors Corporation Defined Contribution Retiree Health Benefit Trust**

**By:**  _____

**Title:**  _____

**Attest:**

_____

**Attachment 1**

| *Name* | *Date of Term Expiration* |
|---|---|
| **Olena Berg-Lacey** | **January 1, 2013** |
| **Robert Naftaly** | **January 1, 2012** |
| **Teresa Ghilarducci** | **January 1, 2011** |
| **\*\*\*** | **January 1, 2010** |

**Committee Chair: \*\*\***

*\*\*\*  The parties are reviewing candidates for the position of fourth Public Class Member.  That information, along with the proposed designation of the Committee Chair (who, pursuant to Section 7.1(a) of the Trust Agreement, will be one of the four Public Class Members) will be submitted to the Court in a supplemental filing on or before January 13, 2006.*

*On or before January 13, 2006, that information will also be available to Class Members and the public by calling the following toll-free number:  800 432-1162.*

_____

**Biographical Material**

**Olena Berg-Lacey -- From 1993 to 1998, Ms. Berg-Lacey served as Assistant Secretary of Labor, Employee Benefits Security Administration.  In that capacity, she directed the Department of Labor's activities regarding enforcement of ERISA, including fiduciary standards governing 700,000 private pension plans with over $3.5 trillion in assets.  From 1991 to 1993, she served in the State Treasurer's Office for the state of California, where she had primary responsibility for management and investment of more than $20 billion of assets on behalf of the State.  In that capacity, she also represented the California Treasurer on the board of the State's pension funds**

- 50 -

(CalPERS and CalSTRS) which together invest over $100 billion of retirement money on behalf of California's public employee retirement programs. A graduate of the University of California and the Harvard Business School, Ms. Berg-Lacey has also held a variety of positions in the private sector involving asset management and institutional investments.

Teresa Ghilarducci --  Ms. Ghilarducci is Professor of Economics at Notre Dame University, where her work focuses on the economics of retirement security.  She served as a member of the Advisory Board to the Pension Benefit Guaranty Corporation (a Presidential appointment) from 1995 to 2002, and was appointed by the governor of Indiana to the Board of Trustees for the Indiana Public Employees' Retirement Fund for a term from 1997 to 2002.  Congressional committees have called upon her to testify as an expert witness more than 12 times on a variety of subjects related to retirement security and other economic issues.

Robert Naftaly --  Robert Naftaly, C.P.A., in the retired President and CEO of PPOM, an independent operating subsidiary of Blue Cross/Blue Shield of Michigan (BCBSM), and Executive Vice President, Chief Operating Officer for the Blues.  Previously, he was Senior Vice President, Chief Financial Officers and Treasurer for BCBSM.  Mr. Naftaly also served as the Director of the Department of Management and Budget of the State of Michigan from 1983 to 1987.  He has also served on several other Boards, including the Detroit Investment Fund, Walsh College, Meadowbrook Insurance Group, Blue Cross/Blue Shield of Maryland, and the Board of Governors of Wayne State University.