**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UAW et al.,

       Plaintiffs,

v.                                             Case No. 05-CV-73991-DT

GENERAL MOTORS CORPORATION,

       Defendant.

                                       /

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Before the court is this health care benefits class action in which the contesting

parties have presented to the court a proposed global settlement agreement. Following

a March 6, 2006 Fairness Hearing at which the proponents of and the objectors to the

proposed settlement agreement were fully heard, the parties submitted proposed

findings of fact and conclusions of law.  Objectors, through counsel, were afforded the

opportunity to comment on those proposed findings and conclusions, and to supply

alternate proposed findings and conclusions.  The court has thoroughly examined the

proposed findings and conclusions, and the objectors' responses to them, in the light of

the documentary evidence, affidavits, arguments and other materials supplied in the

course of this litigation.  The court has carefully considered the positions stated by the

various individual objectors, some represented by counsel and some not, who

presented views in writing and presented oral comments at the Fairness Hearing.[1]

---

[1]The great bulk of the parties' jointly-proposed findings of fact are uncontroverted
by anyone.  Objectors, chiefly the McKnight group, have stated some objections to or
controversions of a few of the proposed findings and conclusions.  The court has
rejected the objectors' contentions, and has accordingly in large measure adopted the

The court now makes the following findings of fact and conclusions of law that shall govern and conclude this litigation.

## I.  FINDINGS OF FACT

### A.  Procedural Background

1.  Defendant General Motors Corporation ("GM") and Plaintiff International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") are parties to a series of collective bargaining agreements ("CBAs") under which GM provides health care benefits to qualifying retirees and their spouses, surviving spouses, and dependents.

2.  On October 18, 2005, Plaintiffs Earl L. Henry and Bonnie J. Lauria, on behalf of a class of retired GM hourly employees and their dependents, joined with the UAW to commence this declaratory judgment action against GM.  On October 31, 2005, Plaintiffs filed an Amended Complaint adding Raymond B. Bailey, Theodore J. Genco, Marvin C. Marlow, Charles R. Miller, and Laverne M. Soriano (referred to collectively with Plaintiffs Henry and Lauria as "Class Representatives") as named plaintiffs.  Class Representatives all receive health care benefits from GM.

3.  All Class Representatives signed retainers authorizing Class Counsel to represent them before they became parties to this litigation.

4.  Other than Plaintiff Soriano, the Class Representatives are GM retirees.  Mrs. Soriano is the surviving spouse of a GM retiree. The six retiree Class Representatives were elected by fellow retirees to serve on various retired worker councils, while Mrs. Soriano was appointed by another elected retiree to serve on the executive board of such a council.

5.  Plaintiff Henry was employed by GM in Flint, Michigan, and was a member of the bargaining unit represented by the UAW until his retirement in 1988.  After his

---

parties' "Joint Proposed Findings of Fact and Conclusions of Law."  The parties will find, however, that some portions of their joint proposed findings and conclusions are not included in this order.  For example, the discussion of GM's financial struggle and the role of retiree health care costs are not repeated herein.  Such portions of the parties' proposed findings and conclusions are unadopted not because the court disagrees with the propositions contained therein, but only because the court believes that points are adequately addressed elsewhere in the order.  Indeed, the court finds nothing of importance within the jointly proposed findings that is not supported by the record evidence.  Certain proposed findings are omitted only for the sake of marginal brevity.

retirement from GM, Mr. Henry was elected by fellow retirees as the Chairperson of the UAW retired workers council covering the Michigan counties of Otsego, Cheboygan, Antrim and Charlevoix.

6.   Plaintiff Lauria was employed by GM in Bay City, Michigan, and was a member of the bargaining unit represented by the UAW until her retirement in 2000.  After her retirement from GM, Mrs. Lauria was elected by fellow retirees as the Chairperson of the UAW retired workers council covering the Michigan counties of Clare, Crawford, Missaukee, Ogemaw, and Roscommon.

7.   Plaintiff Bailey was employed by GM in Willow Run, Michigan, and was a member of a bargaining unit represented by UAW until his retirement in 1993. Following his retirement, Mr. Bailey was elected by his fellow retirees as the chairperson of the UAW retired workers chapter covering GM retirees from his local union.

8.   Plaintiff Genco was employed by GM in Fredericksburg, Virginia, where he was a member of a bargaining unit represented by the UAW.  After his retirement in 2002, Mr. Genco was elected by his fellow retirees as the chairperson of the UAW retired workers chapter covering GM retirees from his local union.

9.   Plaintiff Marlow was employed by GM at its Lakewood Plant and was a member of a bargaining unit represented by the UAW.  After his retirement in 1991, Mr. Marlow was elected by his fellow retirees as the chairperson of the UAW retired workers chapter covering GM retirees from his local union, and was also elected to the regional UAW retired workers council.

10.  Plaintiff Miller was employed by GM in Baltimore, Maryland and was a member of a bargaining unit represented by the UAW.  After his retirement in 2002, Mr. Miller was elected by fellow retirees to serve on the executive board of his local union.

11.  Plaintiff Soriano is the surviving spouse of Jack Soriano, who was employed by GM in Lordstown, Ohio until his retirement in 1985.  Ms. Soriano serves on the executive board of the UAW retired workers chapter covering GM retirees from Mr. Soriano's local union.

12.  In their amended complaint, Plaintiffs alleged that under the terms of the CBAs, GM is "obligated to provide certain retiree health care benefits" to the Class and "may not unilaterally terminate or modify those benefits."  Plaintiffs further alleged that GM's decision, announced in June 2005, that it would make unilateral reductions in health care benefits provided to its retirees, their spouses, surviving spouses, and dependents is an "anticipatory repudiation" of its obligations under the CBA and as plan sponsor and administrator of an employee welfare benefit plan.

3

13.   In Count I, brought under ¶ 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, Plaintiffs sought an injunction and a declaration that retiree health care benefits cannot be unilaterally terminated or modified by GM. In Count II, the Class Representatives sought the same relief, pursuant to ¶ 502(a)(l)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(l)(B) & (a)(3).

14.   GM filed its Answer and Affirmative Defenses to the Amended Complaint on November 14, 2005.  In its Answer, GM denied that the retiree health care benefits it provides are vested benefits that cannot be unilaterally modified or terminated by GM.  GM also asserted affirmative defenses, including that Plaintiffs' claims are barred by the terms of the CBAs, as well as by acquiescence, waiver, ratification and/or estoppel.

15.   On December 15, 2005, Class Representatives filed a motion seeking certification of a class of GM retirees, spouses, surviving spouses, and dependents.  Class Representatives also sought the appointment of Class Counsel.

16.   On December 16, 2005, after Class Counsel had completed their investigation and given their recommendation to Class Representatives, the parties entered into a Settlement Agreement.  Also on December 16, the parties moved the court to preliminarily approve the proposed settlement and order that notice of the settlement be sent to class members.

17.   On December 22, 2005, the court approved the named plaintiffs as Representatives of a Class defined as:

> All persons who, as of November 11, 2005, were (a) GM/UAW hourly employees who had retired from GM with eligibility to participate in retirement in the GM Health Care Program For Hourly Employees, or (b) the spouses, surviving spouses and dependants of GM/UAW hourly employees, who, as of November 11, 2005, were eligible for post-retirement or surviving spouse health care coverage under the GM Health Care Program For Hourly Employees as a consequence of a GM/UAW hourly employee's retirement from GM or death prior to retirement.

On the same date, the court also preliminarily approved the proposed settlement.

### B.  Pre-Lawsuit Negotiations

18.   In early 2005, GM approached the UAW to discuss its desire to change retiree health care for current and future retirees that would result in reducing GM's health care expenses and Accumulated Projected Benefit Obligation ("APBO"). GM expressed concern that its liability for retiree health care benefits was

crippling.  In 2004, GM's reported APBO was $77 billion, $61 billion of which was attributable to UAW retirees.

19.   For months after GM initially requested negotiations concerning retiree health benefits, the UAW refused to enter into such discussions.  GM continued to press for discussions, citing its rapidly deteriorating financial condition and its massive retiree health care obligation, which was disproportionate to the obligation of GM competitors.

20.   In the spring of 2005, GM informed the UAW that it would make unilateral changes in retiree health care benefits to reduce its UAW retiree APBO.

21.   The UAW then agreed to enter into tentative discussions with GM regarding retiree health benefits, on the condition that GM fully open its books and share its complete financial data with the UAW.  The UAW agreed to this course of action because GM retirees are dependent on the corporation's survival for their continued benefits. The UAW recognized that if GM does not survive, retiree medical benefits would be at risk of elimination.

22.   GM accepted the UAW's conditions and provided detailed and confidential documentation of GM's financial condition and projections.

23.   The UAW retained Lazard Freres & Co. LLC ("Lazard") to conduct an independent analysis of GM's financial condition and its stated need to reduce its retiree medical benefits obligations.  GM made top executives in many functional areas of the corporation available to be interviewed by Lazard.  The UAW also instructed Lazard to research GM's financial future and, if GM was truly in a crisis situation, to quantify the impact of various health care savings alternatives that would be least detrimental to retirees while still providing meaningful improvement in GM's prospects for survival as a viable business.

24.   Lazard conducted a thorough financial analysis of GM's condition and reported that the projections GM had presented to Lazard probably underestimated the seriousness of the financial situation.  As the UAW began negotiations with GM, Lazard continued to work and subsequently confirmed the UAW's view that it was better to negotiate a favorable resolution for retirees at that time rather than to wait.  Among other things, it was critical for GM to launch its new 2006 line of large trucks and utility vehicles on time (and without labor difficulties); GM's financial situation would likely continue to deteriorate; and GM's available cash was likely to dissipate.

25.   Lazard further informed the UAW that if negotiations concerning retiree health benefits were delayed, GM's financial situation could worsen requiring even greater reductions in retiree medical benefits to meaningfully help GM return to financial viability.

26.  The 2005 negotiations between the UAW and GM regarding retiree health care benefits were intense, highly adversarial, and hard-fought.  Negotiations began in late spring and concluded the following fall.  During the final month of the negotiation process, UAW and GM negotiators held protracted meetings on a daily basis.

27.  During the negotiations, GM sought deep cuts in retiree health benefits, specifically, reductions of $20-$25 billion in its APBO liabilities.  Based on Lazard's and other expert analysis, the UAW concluded that it was not possible to reduce GM's APBO sufficiently to address a risk of financial crisis without making some changes in retiree health care benefits. Specifically, given the more than four-to-one ratio of UAW retirees, surviving spouses and dependents to active workers, concessions by active workers would not reduce GM's APBO enough to keep GM viable and to secure GM's agreement not to make unilateral changes in retiree benefits.  The UAW accordingly concluded that in order to achieve sufficient savings on the GM APBO, it was necessary to agree to reductions for both active workers and retirees.

28.  The UAW refused to agree to the APBO reductions of $20-25 billion sought by GM, and instead bargained for a modified plan that provided GM with APBO savings of approximately $15 billion. That reduction, however, does not represent $15 billion in reductions to current and future retiree health care benefits. The UAW insisted that GM contribute $3 billion to a Defined Contribution Voluntary Employees' Beneficiary Association trust ("DC-VEBA") to help fund retiree health benefits, to which active employees also agreed to contribute wage and cost-of-living adjustments ("COLA") that have a present value of approximately $4 billion over the next twenty years.

29.  During the negotiations, GM proposed numerous specific reductions to retiree health care that the UAW rejected.  For example, GM proposed increasing prescription drug co-payments to $20 for generic and $30 for brand-named drugs.  The UAW, however, insisted upon retaining the current $5 generic co-pay and accepted an increase for brand-named drugs of $10 from the current $5.  GM also proposed increasing deductibles, co-payments, monthly contributions, and out-of pocket maximums by the full amount of actual medical inflation, which recently has exceeded 10 percent per year.  The UAW rejected this proposal as well, insisting that such increases be capped at three percent annually.  In addition, GM sought to limit any "protected group" — *i.e.*, retirees who keep their current health care benefits except for certain administrative changes — to retirees and surviving spouses with pensions below $5,000 per year and pension benefit rates of less than $33.33.  The UAW insisted on expanding any such group to include individuals with annual pensions of $8,000 or less and monthly pension benefit rates of less than $33.33. While line-drawing of this kind is inherently subject to criticism by those marginally above the line, the UAW's insistence of an $8,000 pension line, ultimately accepted by GM, served to better

6

protect retirees and surviving spouses least able to afford additional health care benefits.

30.   During the course of Class Counsel's investigation in the Fall of 2005, the UAW informed Class Counsel that GM had made multiple and significant concessions to the relative benefit of retirees during bargaining.

## C.  Memorandum of Understanding

31.   On October 29, 2005, after the lawsuit was filed, the UAW and GM entered into a Memorandum of Understanding, which laid out a basic framework for settlement of the claims made in this litigation.

32.   Active hourly employees ratified the Memorandum of Understanding on November 11, 2005 by a substantial margin of the vote.[2]

33.   Under the terms of the Memorandum of Understanding, active GM hourly employees will give up certain previously negotiated wage increases, cost-of-living allowance adjustments, and profit sharing plan offsets in order to contribute to funding retiree health care benefits

34.   The Memorandum of Understanding also provides that "Future Retirees," defined as hourly GM employees retiring after November 11, 2005, will receive retiree health care benefits pursuant to the terms of the Settlement Agreement on the same basis as class members even though Future Retirees are not present class members.

## D.  The Proposed Settlement

35.   The parties' settlement provides for the amendment of GM's health care program and the establishment of a "DC-VEBA," which will be used to mitigate payments made by retirees for health care coverage.

36.   The health care coverage that GM has provided to members of the Class pre-settlement is unusually comprehensive. Retirees have paid no monthly premiums or yearly deductibles of any kind.

37.   More than 73,000 retiree households with GM annual pensions of under $8,000 or who receive a pension based on a monthly rate of $33.33 or less per year of credited service. For them, the comprehensiveness of health care benefits

---

[2] More than 60% of those voting approved the Memorandum of Understanding. One objector at the Fairness Hearing characterized this as a "razor-thin" margin of approval.  The court rejects such a characterization.

remains essentially unchanged.  Under the settlement, these "Protected Retirees" will continue to pay no monthly premiums or yearly deductibles. Protected Retirees will see only very minor modifications to their benefits.

38.     Also under the settlement, remaining class members who participate in the regular GM program, termed "General Retirees," will pay modest new charges as part of a "Modified Plan."  In the initial plan year, and taking into account mitigation provided by the DC-VEBA, the impact on General Retirees will be as follows:

> Monthly premiums will be $10 for individual participants and $21 for family participants; deductibles will be $150 per individual participant, subject to an aggregate limit of $300 per family; and

> "Co-insurance" will be instituted, meaning that General Retirees will be responsible for 10% of most medical charges.  The effect of this new co-insurance will be minimal because a new "out-of-pocket" maximum will cap deductibles and co-insurance at $250 per single person and $500 per family for in-network services.

> Including the mitigation provided by the DC-VEBA, these new charges will initially cost a single retiree a maximum of $370 per year ($120 in premiums, $150 in a deductible, and another $100 in coinsurance to reach the out-of-pocket maximum), and will initially cost a family a maximum of $752 per year ($252 in premiums, $300 in a deductible and another $200 in coinsurance to reach the out-of-pocket maximum).

39.     Prescription drug coverage is, in summary form, as follows for General Retirees.

> For drugs purchased at retail, the co-payment is $5 for generic drugs, $10 for brand-name drugs.  For drugs purchased by mail order, the co-payment is $10 for generic drugs, $15 for brand-name drugs.  These drug co-payments are only slightly changed from the co-payments in effect under the existing retiree health care plan.

40.     A co-payment rate of $50 per emergency room visit applies, unless the patient is admitted, in which case the co-payment is waived.

41.     All of these dollar-denominated amounts are subject to annual increases of no more than three percent per year.  Given that retiree health care costs rose almost 10% last year alone and are expected to increase at a similar rate for the foreseeable future, this limitation on cost increases provides significant protection to retirees in the future.

42.   The Modified Plan under the Settlement Agreement provides a range of benefits for retirees that substantially exceeds the benefits generally available to most other retirees with employer-sponsored retiree health care plans, and at a cost to the retirees that is substantially less than the cost most other retirees pay.

43.   Specifically, the Modified Plan is more generous compared to many other retiree health care plans in the following respects:

a.  Under the Modified Plan, with the offset provided by the DC-VEBA, the retiree cost-share of the monthly premium cost of the health care program is approximately 1.6%, which is dramatically lower than the national average of 38% paid by older retirees.

b.  In absolute dollar terms, the retirees' monthly contribution towards the premium cost under the Modified Plan is well below the premium contributions required on average under other retiree health insurance plans.  Taking in to account the mitigation payments from the DC-VEBA, individuals and families will pay only $10 and $21, respectively, towards their monthly premiums.  These sums are far below the $128 average monthly premium paid for single coverage by post-65 retirees, or the $223 average monthly premium paid for single coverage by pre-65 retirees.

c.  The Modified Plan's annual deductible, mitigated by the DC-VEBA, is $150, well below the national average of $250 in 2005.  Similarly, with the DC-VEBA offset, the Plan's out-of-pocket maximum is $250 for in-network services and $500 for out-of-network services, far below the $1,500 national average.

44.   Under the terms of the Settlement Agreement, GM remains responsible for providing retiree health care coverage.  Funds in the DC-VEBA will be used to mitigate the monthly contributions, deductibles, out-of-pocket maximums, and/or co-insurance amounts payable by retirees. [3]

---

[3]  McKnight complained that the Settlement Agreement includes language to the effect that GM does not "guarantee" that DC-VEBA assets will mitigate retiree health care costs.  The DC-VEBA is a financial investment mechanism. GM's only obligation under the DC-VEBA is to contribute the agreed amount of money. GM is not a guarantor. Even though the "health" of the DC-VEBA is not "guaranteed," an actuarial analysis commissioned by the UAW and performed by Milliman shows that the DC-VEBA will mitigate retiree health costs at the level described above for at least twenty years.  The GM data underlying Milliman's analysis was available to objectors.  No objector performed an independent analysis.

9

45.     Most retiree health care plans are not pre-funded as to their future liabilities,
        thereby leaving vulnerable the financial viability of future benefits.  By contrast,
        the DC-VEBA pre-funds a portion of retiree benefits.  This funding mechanism
        makes the GM Modified Plan more solvent than many large employer-sponsored
        retiree health care programs.  The DC-VEBA is expected to remain solvent and
        able to fulfill its mitigation function long after 2011, when the UAW or GM may
        elect to terminate the settlement agreement.

46.     Active GM/UAW employees are contributing to the DC-VEBA, and thus are
        subsidizing retiree medical benefits, through a variety of income deferrals.  In
        simplified terms, a cumulative total of $.17 per hour will be diverted from quarterly
        cost of living increases that would otherwise be payable to active employees.
        Active employees also will contribute a September 18, 2006 three percent
        general wage increase, equivalent to an average of $.83 per hour; these
        amounts also will be transmitted to the DC-VEBA.  Active employees also will
        contribute an additional $.02 per hour of their scheduled cost of living increases
        (COLA) to the DC-VEBA each quarter.  These COLA increases will compound
        over time.

47.     Each active employee thus will initially contribute to the DC-VEBA about $1.00
        per hour worked, or about $2,000 in the initial plan year, helping to enable a
        settlement wherein class members will enjoy quality medical coverage for about
        $370 a year.  Active employees' contributions will increase every quarter
        thereafter.

48.     Because active employees will receive the same retirement benefits as current
        retirees, active employees will "participate" in the give-back twice. In total, active
        employees give up the following: (1) one dollar per hour in scheduled wage and
        COLA increases; (2) an additional two cents per hour each quarter (cumulative)
        in COLA increases for all future quarters; (3) the flow-through impact of these
        wage and COLA diversions on other benefits, such as overtime and shift
        premiums, vacation and holiday pay, sickness and accident benefits, etc.; and
        (4) their opportunity for fully paid health care from GM when they retire.

49.     In addition, under the settlement, GM will contribute a minimum of $3.0 billion to
        the DC-VEBA.  Specifically, once the Settlement Agreement becomes effective,
        GM will make a cash contribution of $1.0 billion, with a second $1.0 billion cash
        contribution one year later.  GM will make a third cash contribution of $1.0 billion
        in 2011, or earlier if assets in the DC-VEBA fall below a specified amount.  GM
        will also contribute the incremental profit-sharing payments attributable to the
        write-off of healthcare related costs savings for the years 2006 to 2012.  GM has
        guaranteed that such payments will be at least $30 million for each of those
        years.

50.    In addition, GM will be required to make cash contributions to the DC-VEBA based on the increase in the value of eight million shares of GM common stock. Further, if GM raises dividends on its common stock within certain parameters, GM will make an additional substantial cash contribution to the DC-VEBA. Should retiree health care benefit savings, as well as other measures taken by GM, allow the company to regain profitability, these provisions will give class members a share of GM's increased value or dividends.

51.    The Settlement Agreement also changes the "hold harmless" arrangement under the current GM retiree health care plan. Under the current (and under the Modified Plan), non-participating providers may bill for amounts above the "reasonable and customary" charges set by the plan. Under the current plan's hold harmless arrangement, though, retirees who choose to see a non-participating provider generally do not have to pay amounts above the "reasonable and customary" charge, even if the retiree could have gone to a participating provider. Under the Modified Plan in the settlement, retirees will continue to be protected by the hold harmless arrangement when they receive care from a non-participating provider in situations in which they had no choice but to do so. However, they will not be protected if they choose a non-participating provider despite the availability of a participating provider. The Modified Plan provides that "[t]he enrollee will be responsible for all fees charged above [the reasonable and customary level], unless the enrollee is in a situation in which the enrollee does not have the ability or control to select a par[ticipating] provider to perform the service." Thus, under the Modified Plan, retirees may still use non-participating providers without paying amounts above the reasonable and customary charge when they could not do otherwise, such as for example, because there are no participating health care providers in the retiree's geographic area; someone else chooses the provider, such as an anesthesiologist for surgery; or where the retiree is suffering a health crisis and requires urgent medical attention from the first doctor who is able to provide it. These provisions are reasonably tailored to reduce the cost of the health plan to GM without undue hardship for retirees.

52.    The Settlement Agreement includes a Trust Agreement, Exhibit 4 to the Settlement Agreement, which will govern the operation of the DC-VEBA trust established by the parties. The Trust Agreement includes provisions for the establishment of a Committee to govern the DC-VEBA, provides that Olena Berg-Lacey, Robert Naftaly, Teresa Ghilarducci, and David Baker Lewis will serve as the initial Public Members of the Committee, and includes a mechanism for selection of successor Public Members as necessary.

53.    The Settlement Agreement will continue in effect according to its terms at least until September 14, 2011. Thereafter, the Settlement Agreement will continue in effect indefinitely, unless either GM or the UAW elects to terminate it.

11

54.     In the event of GM's bankruptcy, or a judicial ruling, resulting in a determination that benefits are not vested, the effect on many Class Members would be devastating.  Class members ineligible for Medicare or other employer-paid health insurance would have to spend, at the least, several thousand dollars each year for coverage comparable to that provided under the parties' settlement.  Class members over age 65 with no other source of private health care benefits would have to rely solely on Medicare, which requires considerable out-of-pocket expenditures:

        (a)  The current monthly premium for Medicare Part B coverage (physician services and outpatient care) is $88.50, with an annual deductible of $124.

        (b)  Most doctor services, outpatient therapy, preventative services, and durable medical equipment are covered at just 80% of the Medicare-approved amount; retirees would be responsible for the remaining 20%.

        (c)  The deductible for hospitalization of a period from one to 60 days is $952 per benefit period.

        (d)  Retirees must pay $119 per day for days 20 through 100 of a skilled nursing facility nursing stay for each benefit period.

        (e)  Medicare Part D, conferring certain prescription drug benefits, requires an average monthly premium of $32.00 and has a separate annual deductible of $250.  Thereafter, the beneficiary pays 25% of the cost of a covered Part D prescription drug up to an initial coverage limit of $2,250 and then pays the full cost of the medicine until the total out-of-pocket expenses on formulary drugs for the year, including the deductible and initial co-insurance, reach $3,600.  Because of Part D's 25% co-insurance provision, drug costs will likely remain substantial.  According to a recent Kaiser Family Foundation report, it is anticipated that per capita out-of-pocket drug spending among Medicare beneficiaries in 2006 will be approximately $1,000.

55.     Even with "Medigap" coverage, a Medicare-eligible retiree would not have coverage as comprehensive or inexpensive as the coverage that the Modified Plan provides under the parties' settlement.  According to a 2004 study conducted by the American Association of Retired Persons, non-institutionalized Medicare beneficiaries with Medigap coverage averaged over $5,100 in out-of-pocket expenses in 2003.  Those class members who are not Medicare-eligible would have no coverage at all.

56.     In contrast, the proposed plan for General Retirees provides excellent coverage (including dental and vision), and for the first plan year limits new charges to $370 per individual participant ($752 per family) which, along with the longstanding existing charges, are relatively modest.

## E. General Findings

57.     There is no direct or inferential evidence supporting a conclusion that there was improper collusion among or between any of the parties to this litigation.  To the contrary, the record evidence, most particularly the evidence surrounding the negotiation of the settlement, shows that the parties' conduct in connection with this litigation was at all times above-board and non-collusive.

58.     Class Counsel diligently investigated the proposed settlement, acted solely in the interest of the Class, and concluded based upon the expert opinions available to them and their considerable experience in like cases that the settlement is fair, reasonable, and adequate.

59.     There is no evidence supporting a conclusion or an inference that the UAW was improperly motivated to preserve active employees' compensation at the expense of retiree medical benefits.  To the contrary, the evidence amply supports a finding that the UAW negotiated the settlement in good faith and for the purpose of furthering the strong mutual interest of active and retired employees in keeping GM in business, enabling the company to continue to employ active employees and to continue to provide benefits to retirees.

60.     This case does not involve a limited fund, an artificially created limited fund, or an externally limited pool of assets for satisfaction of competing claims.  Nor does this case involve anything analogous to any of a limited-fund case.  To the contrary, the evidence establishes that a key objective of the settlement is to address GM's financial struggle and maintain the company's viability, allowing the continued generation of income from which both active employees and retired employees will benefit for the foreseeable future.

61.     Although cost increases entailed by the settlement are modest, some individual class members will face hardship as a result of these new charges.  Such hardship is regrettable but inevitable.  The potential loss of *all* benefits, due to either GM's financial collapse or GM's prevailing on the merits, would be far more harsh for Class Members.

## II.  CONCLUSIONS OF LAW

## A. Jurisdiction

1. The court has jurisdiction under Section 301 of the LMRA, 29 U.S.C. § 185, and Section 502(e)(1) and (f) of ERISA, 29 U.S.C. § 1132 (e)(1) and (f).

## B. Class Certification

2. To be certified, the proposed class must meet the requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy), and one of the three options in Rule 23(b). *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1992); *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc). When, as here, a case is settled before the class is certified, the requirements of Rule 23 that are designed to protect absent class members, such as adequacy of representation, "demand undiluted, even heightened, attention." *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 849 (1999).

3. Following a hearing on December 22, 2005, the court concluded that the requirements of Rule 23(a) and 23(b)(2) had been satisfied and certified the Class. Based on the record after the fairness hearing, the court again concludes that those requirements are met.

   i. Numerosity: There are more than 470,000 individuals in the plaintiff class, which satisfies the Rule 23(a)(1) requirement that the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see also*, *e.g.*, *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 n.1 (6th Cir. 1997) (objection to numerosity requirement in 1,000-member class was "frivolous"); *Reese v. CNH Am. LLC*, 227 F.R.D. 483, 486 (E.D. Mich. 2005) (certifying claims of 1,400 retirees); *Rankin v. Rots*, 220 F.R.D. 511, 517 (E.D. Mich. 2004) (certifying ERISA claims for class alleged to be in the "thousands").

   ii. Commonality: The Rule 23(a)(2) requirement of commonality "'simply requires a common question of law or fact.'" *Reese*, 227 F.R.D. at 487 (quoting *Bittinger*, 123 F.3d at 884); *see also Sprague*, 133 F.3d at 397 (noting that there need only be one such question). "The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 422 (6th Cir. 1998). In this case, whether or not GM has the right unilaterally to modify retiree benefits, as it claims, is a question of law common to the class. *See Bittinger*, 123 F.3d at 879, 884 (finding commonality where retirees sought guaranteed lifetime, fully-funded benefits, even though a series of different CBAs governed those benefits); *Reese*, 227

15

F.R.D. at 487 (commonality established even though plaintiffs retired at different times and under different CBAs); *Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 596 (E.D. Mich. 1996) (evaluation of effect of defendants' reservation of rights provides common question satisfying Rule 23(a)(2)).

iii.  Typicality: A "'plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (quoting 1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 3-13, at 3-76). As with commonality, the typicality requirement is not an onerous one; so long as there is a strong similarity of legal theories, the requirement is met "even if substantial factual distinctions exist between the named and unnamed class members." *Rankin*, 220 F.R.D. at 518; *see also Bittinger*, 123 F.3d at 884-85; *Forbush v. J.C. Penny Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993).

4.  Here, Plaintiffs claim that GM's planned unilateral modifications to retiree health care benefits violate its obligations under ERISA and its contractual obligations under the collective bargaining agreements. That claim, asserting a uniform obligation by GM, satisfies typicality, notwithstanding any possible factual variations with respect to individual class members. *Bittinger*, 123 F.3d at 884 (claim that defendant "originally planned to provide lifetime, fully-funded benefits to retirees" satisfies typicality); *see also Reese*, 227 F.R.D. at 487; *Rankin*, 220 F.R.D. at 518.

5.  Adequacy of Class Representatives: The Sixth Circuit has identified two criteria for determining whether class representatives are adequate: "1) [t]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976). Here the class representatives have the same, common interest in protecting retiree health care benefits, and there is nothing to suggest that they would not vigorously protect the interests of the class. *See Amchem*, 521 U.S. at 625-26 (stating that class members must "'possess the same interest and suffer the same injury'" to meet the Rule 23(a)(4) adequacy requirement).

6.  There are no potential intra-class conflicts that would jeopardize adequate representation or prevent class certification. In this regard, "it is well settled that only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Georgia State Conference of Branches of NAACP v. Georgia*, 99 F.R.D. 16, 34-35 (S.D. Ga. 1983) (citing Fed. Prac. & Proc. §1768); *see also Mueller v. CBS, Inc.*, 200 F.R.D. 227, 238 (W.D. Pa. 2001). Hence, mere "differences in the interests of the class representatives and the other class members are not dispositive under Rule 23(a)(4). The key

16

question is whether the interests are *antagonistic*."   *Steiner v. Equimark Corp.*, 96 F.R.D. 603, 610 (W.D. Pa. 1983) (emphasis in original);   *Mullen v. Treasure Chest Casino, LLC* , 186 F.3d 620, 625-26 (5th Cir. 1999) ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests.");   *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998) (factual variations among class members do not defeat adequacy where they are united in seeking relief on behalf of the class).

7.   The court comprehends that the settlement will impose different economic impacts based on different preexisting financial circumstances of particular class members. This fact does not, however, show conflicting or antagonistic interests. *See Kamen v. Kemper Fin. Servs., Inc.*, 908 F.2d 1338, 1350 (7th Cir. 1990) (class need not be "perfectly homogeneous"; "differences in incentives pervade class actions" but must be distinguished from a "concrete conflict of interest between the 'representative' and other members of the class"), *rev'd on other grounds*, 500 U.S. 90 (1991); *Halford v. Goodyear Tire & Rubber Co.*, 161 F.R.D. 13, 20 (W.D.N.Y. 1995) (claims seeking injunction requiring defendant to reinstate negotiated retiree benefits present no antagonism among class members); *Edmondson v. Simon*, 86 F.R.D. 375, 381 (N.D. Ill. 1980) (interests must be co-extensive, not identical); Moore's Federal Practice § 23.25.  To hold otherwise would require the class to be fragmented based on minute individual differences divorced from any notion of antagonism, which would endanger the class action device and discourage settlements.  *See In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005) ("[I]f subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened.  Such a fragmented class might be unmanageable, certainly would reduce the economic incentives [of class litigation], and could be extremely difficult to settle") (quoting John C. Coffee Jr., *Class Action Accountability:  Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 398 (2000)).

8.   In evaluating the adequacy of potential class counsel, Rule 23(g)(1)(I) requires the court to consider:  (a) the work counsel has done in identifying or investigating potential claims in the action, (b) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (c) counsel's knowledge of the applicable law, and (d) the resources counsel will commit to representing the class.

9.   Class Counsel in this case is well qualified, more than adequate to the task and has the resources to commit  to representing the class.  Class Counsel has extensive knowledge of the law relating to retiree benefits litigation, and has years of experience litigating dozens of actions of this kind.

17

10.   Finally, the class may be certified under Rule 23(b)(2) in that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2). The requirements of this subsection are met when "the common claim is susceptible to a single proof and subject to a single injunctive relief."  *Senter*, 532 F.2d at 525.  Courts routinely certify, under Rule 23(b)(2), claims challenging an employer's modification of health care benefits, holding that in such cases, the employer's alleged conduct is directed at the class as a whole and hence class-wide injunctive or declaratory relief  is appropriate.  *See Forbush*, 994 F.2d at 1106; *Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 665 (E.D. Mich. 1995) ("[I]t is abundantly clear that the … decision by [defendant] with regard to the then-existing health care benefits affected the entire proposed class, thus making the issue of a permanent injunction and corresponding declaratory relief facially appropriate."); *Halford*, 161 F.R.D. at 20 (certifying claim that defendant has a contractual obligation to provide lifetime health care benefits to retirees and eligible spouses).  Plaintiffs' claims in this case are all based on the contested question of whether GM may unilaterally modify retirees' health care benefits - - claims which are "susceptible to a single proof and subject to a single injunctive remedy," and hence are properly certified under Rule 23(b)(2).  *Senter*, 532 F.2d at 525.

Accordingly, the court **GRANTS** final certification of the class defined above in the

Findings of Fact.

## C. Final Approval of the Class Action Settlement.

11.   The court evaluates the proposed settlement in light of the general federal policy favoring the settlement of class actions.  *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers*, 803 F.2d 878, 880 (6th Cir. 1986) (per curiam); *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981), *vacated and modified on other grounds*, 670 F.2d 71 (6th Cir. 1982); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003); *Berry v. Sch. Dist.*, 184 F.R.D. 93, 97 (W.D. Mich. 1998).

12.   Given this well-settled policy, "a district court's role in evaluating a private consensual agreement 'must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.'" *Clark Equip. Co.*, 803 F.2d at 880 (quoting *Officers For Justice v. Civil Service Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)); *see Berry*, 184 F.R.D. at 97 ("The court's role … 'is properly limited to the minimum necessary to protect the

interests of the class and the public'"); *Shy v. Navistar Int'l Corp.*, 1993 U.S. Dist. LEXIS 21291 (S.D. Ohio 1993); *Bronson v. Bd. of Educ.*, 604 F. Supp. 68, 78 (S.D. Ohio 1984); Fed. R. Civ. P. 23(e)(1)(C) (stating that court may approve class settlement "on finding that it is fair, reasonable, and adequate").

13.  To ensure that the interests of the members of the class are protected, Rule 23(e)(1)(C) requires the court to hold a hearing to determine whether the settlement is a "fair, reasonable, and adequate" resolution of class members' claims.

14.  Because the very point of compromise is to avoid determining contested issues and to avoid the expense and uncertainty of litigation, the court should not "decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands*, 450 U.S. 79, 88 n.14 (1981); *Clark Equip. Co.,* 803 F.2d at 880 (a court should not examine "the factual or legal disputes which underlie the merits of the dispute"); *see Detroit v. Grinnell Corp.*, 495 F.2d 448, 456 (2d Cir. 1974) (the trial court does not "have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute"); *Robinson v. Ford Motor Co.*, 2005 U.S. Dist. LEXIS 11673, at *12 (S.D. Ohio 2005); *In re Telectronics Pacing Sys, Inc.,* 137 F. Supp. 2d 985, 1027 (S.D. Ohio 2001); *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 359, 379 (N.D. Ohio 2001); *Huguley v. Gen. Motors Corp.*, 128 F.R.D. 81, 87-88 (E.D. Mich. 1989).

15.  The court ought not engage in the "'detailed and thorough investigation that it would undertake if it were actually trying the case.'" *Berry*, 184 F.R.D. at 98 (quoting *Armstrong v. Bd. of Sch. Directors*, 616 F.2d 305, 315 (7th Cir. 1980)); *Grinnell Corp.*, 495 F.2d at 462; *see also* FED. PRAC. & PROC. § 1797.5 ("The court may not try disputed issues in the case since the whole purpose behind a compromise is to avoid a trial.  Rather the judge is restricted to determining whether the terms proposed are fair and reasonable.").

16.  In evaluating a proposed class settlement, the court "may limit the fairness hearing 'to whatever is necessary to aid it in reaching an informed, just and reasoned decision.'" *Tenn. Ass'n of Health Maint. Orgs.*, 262 F.3d 559, 567 (6th Cir. 2001) (quoting *United States v. Oregon*, 913 F.2d 576, 582 (9th Cir. 1990)); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1976); *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("[e]ven when the Court becomes aware of one or more objecting parties, the Court is not 'required to open to question and debate every provision of the proposed compromise.'") (quoting *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977)); 4 Newberg § 11:57 ("The court, in its discretion, may limit the discovery or presentation of evidence to that which may assist it in determining the fairness and adequacy of the settlement.").

19

17.   The court may consider briefs, declarations, affidavits and the arguments of counsel and need not conduct an evidentiary hearing or take live testimony. *E.g.,Tenn. Ass'n of Health Maint. Orgs.*, 262 F.3d at 567 ("we reject intervenors' suggestion…that the fairness hearing must entail the entire panoply of protections afforded by a full-blown trial on the merits"); *see also Newby v. Enron Corp.*, 394 F.3d 296, 307 (5th Cir. 2004); *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187 (10th Cir. 2002) ("[A]n objector '"is not entitled, as a matter of right, to an evidentiary hearing during a settlement hearing."'"); *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994); *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 527 (1st Cir. 1991); *Handschu v. Special Servs. Div.*, 787 F.2d 828, 834 (2d Cir. 1986) ("The district court correctly concluded that it would be inconsistent with the salutary purposes of settlement to conduct a full trial in order to avoid one.").[4]

## 1.  The Settlement Factors

18.   Courts have fashioned a series of factors to assist in weighing the potential risks and rewards inherent in going forward with litigation against the certainty of a compromise solution.  Factors relevant to the court's evaluation are:

    i.   the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement;

    ii.  the risks, expense, and delay of further litigation;

    iii. the judgment of experienced counsel who have competently evaluated the strength of their proofs;

    iv. the amount of discovery completed and the character of the evidence uncovered;

    v.  whether the settlement is fair to the unnamed class members;

    vi. objections raised by class members;

    vii. whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and

    viii.    whether the settlement is consistent with the public interest.

*In re Cardizem*, 218 F.R.D. at 522; *see also, e.g., Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992); *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983); *Berry*, 184 F.R.D. at 98; *Robinson*, 2005 U.S. Dist. LEXIS 11673, at *13.

19.   The court may choose to consider only those factors that are actually relevant to the settlement at hand, and may weigh particular factors according to the demands of the case.  *Granada Invs., Inc.*, 962 F.2d at 1205-06.

---

[4] *See also* this court's order of March 31, 2006 order [Dkt. # 1417] rejecting various evidentiary objections raised by the McKnight objectors.

      **a.**    **The likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement.**

20.    A significant factor in the court's evaluation of a proposed settlement is the likelihood of success on the merits weighed against the relief offered in the settlement.  *Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999); *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); *see* 2 NEWBERG § 11:44 (3d ed. 1992).

21.    Although this factor requires "'some evaluation of the merits of the dispute, the district court must refrain from reaching conclusions upon issues which have not been fully litigated.'"  *Berry*, 184 F.R.D. at 98 (quoting *Armstrong*, 616 F.2d at 314).  The ultimate question, rather, is "'whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued.'"  *In re Cardizem*, 218 F.R.D. at 522 (quoting Manual for Complex Litig. ("MCL") § 30.42 at 238 (3d ed. 1995)); *see also Shy,* 1993 U.S. Dist. LEXIS 21291, at *11 ("It is neither required, nor is it possible for a court to determine that the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, taken as a whole, must be fair, adequate and reasonable.") (citing *Clark Equip. Co.*, 803 F.2d 878).

## *The question of whether retirees' benefits are vested*

22.    The ultimate issue in this case is  whether retiree health care benefits are vested, an issue upon which the plaintiffs and defendant have historically been, and remain, deeply divided. The Class and UAW, on the one hand, and GM, on the other, assert that a body of Sixth Circuit case law supports their respective opposing positions.  *See*, *e.g.*, *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983); *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417 (6th Cir. 2004); *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998);*Yolton v. El Paso Tenn. Pipeline*, 435 F.3d 571 (6th Cir. 2006); *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996); *Cole v. ArvinMeritor, Inc.*, 2005 U.S. Dist. LEXIS 38235 (E.D. Mich. 2005); *Bittinger v. Tecumseh Prods. Co.*, 83 F. Supp. 2d 851 (E.D. Mich. 1998), *aff'd*, 201 F.3d 440 (6th Cir. 1999) (per curiam); *Int'l Union, United Auto. Workers v. Cleveland Gear Corp.*, 1983 WL 2174, at *2 (N.D. Ohio 1983), *aff'd*, 1984 U.S. App. LEXIS 13700 (6th Cir. 1984) (per curiam).

23.    The parties make a variety of legal and factual arguments in support of their positions, demonstrating the sharply-contested nature of the dispute.  This litigation comprises a genuine case or controversy.  In the end, however, the court need not resolve this sharply contested dispute, and indeed it would be inappropriate for it to do so.  *See Grinnell Corp.*, 495 F.2d at 456 (court does not have the "right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute.").  Instead, the relevant question

is whether the parties have been able to assess their respective positions accurately and thus to make an informed and appropriate determination about the relative merits and risks of settlement.  The settling parties' written submissions and argument make clear that they have extensively analyzed the relevant plan documents, have a firm grasp of the relevant law, and have thoroughly evaluated the respective arguments on the merits.

24.    The settling parties recognize that, whatever the relative strengths of their positions, litigation brings with it substantial risks.  Thus, however strong the plaintiffs' or GM's position may be, all parties recognize the inherent uncertainties of litigation and the potentially catastrophic consequences for retirees should a court hold that their health-care benefits are not vested.  Such a holding would mean that GM is free not merely to *modify* those benefits but to *eliminate* them.  The plaintiffs and UAW reasonably concluded that the risk of consequences so grave, no matter how unlikely they may think it is, was worth avoiding through a settlement that guarantees continued health care benefits for the class.  *See Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 246 (S.D. Ohio 1991) ("'[C]lass counsel and the class representatives may compromise their demand for relief in order to obtain substantial assured relief for the plaintiffs' class.'") (quoting *Vukovich*, 720 F.2d at 922); *see also Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) ("The fact that the plaintiff might have received more if the case had been fully litigated is no reason not to approve the settlement."); *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 509 (W.D. Pa. 2003) ("As is true in any case, the proposed Settlement 'represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution'") (citation omitted); *Schaefer v. Tannian*, 895 F. Supp. 175, 178 (E.D. Mich. 1995) ("The court need not disapprove the settlement because a plaintiff might have received more if the case had been fully litigated."); *Brown v. Steinberg,* 1990 U.S. Dist. LEXIS 12561, at *6-8 (S.D.N.Y. 1990) (holding that class settlements may be approved though they are only a fraction of the potential recovery, collecting cases).

25.    It was reasonable and appropriate for the plaintiffs to conclude, in light of GM's dire financial circumstances,  that the interest of GM retirees lay not in achieving a Pyrrhic victory in court but in actually continuing to receive their health care benefits and that the best means to that end lay in making reasonable concessions in settlement now in order to increase the likelihood that GM could survive in a form in which it could continue to pay the retirees' benefits. Their judgment is entirely appropriate and reasonable under the circumstances of this case.  *See*, *e.g.*, *Montgomery v. Aetna Plywood*, 231 F.3d 399, 404 (7th Cir. 2000) (plaintiffs negotiated lower recovery because of risk that verdict would bankrupt defendants); *In re Milken and Assocs. Sec. Litig.*, 150 F.R.D. 46, 55-56 (S.D.N.Y. 1993) (noting danger that prolonged litigation could impair defendant's ability to pay); *Shy*, 1993 U.S. Dist. LEXIS 21291, at *46 ("Even if the retirees prevail on [the vesting issue], such a victory would be indeed hollow, because it

22

would inevitably lead to Navistar's liquidation."); *In re Warner Communs. Sec. Litig.*, 618 F. Supp. 735, 746 (S.D.N.Y. 1985) ("[T]he 'prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures.'").

26.   The parties adequately assessed the strengths of their respective positions on the merits and reasonably decided that the issue of vesting is not so one-sided so as to make any settlement unreasonable. The reasonableness of this decision is reinforced considering GM's financial condition and the potential for dire consequences to the Class of a outright loss in litigation.

### *Benefits of the Settlement*

27.   Courts routinely recognize that settlements never equal the full value of the loss claimed by the plaintiffs.  "In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."  *Grinnell Corp.*, 495 F.2d at 455 n.2; *see also Weinberger v. Kendrick*, 698 F.2d 61, 65 (2d Cir. 1982) (approving class settlement where "recovery will be only a negligible percentage of the losses suffered by the class"); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (collecting cases where courts approved class action settlements providing from 0.2% to 16% of potential recovery), *aff'd*, 166 F.3d 581 (3rd Cir. 1999).

28.   Moreover,  "[a] just result is often no more than an arbitrary point between competing notions of reasonableness."  *In re Corrugated Container Antitrust Litig. (II)*, 659 F.2d 1322, 1325 (5th Cir. 1981); *see Lazy Oil Co.*, 95 F. Supp. 2d at 338.  Thus, "[i]n assessing the settlement, the Court must determine 'whether it falls within the 'range of reasonableness,' not whether it is the most favorable possible result in the litigation.'"  *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 (N.D. Ga. 1993) (quoting *Fisher Brothers v. Cambridge-Lee Indus.*, 630 F. Supp. 482, 489 (E.D. Pa. 1985)).

29.   The benefits to the Class from the Settlement are substantial.  The Settlement accomplishes necessary cost savings for GM while maintaining virtually the same comprehensive level of coverage for Class Members with only a slight increase in their share of the cost.  Indeed, the evidence establishes that the Modified Plan provides a range of benefits for retirees that substantially exceeds the benefits generally available to most other retirees with employer-sponsored retiree health care plans, and at a cost that is substantially less than the cost most other retirees pay.

30.   The court concludes that the benefits provided to the plaintiffs - -continued comprehensive health care benefits with only a modest increase in cost - -  are

fair, reasonable, and adequate when weighed against the uncertainties of litigation and the risks posed by GM's undisputed distressed financial condition.

### b. The risks, expense, and delay of further litigation.

31.   Complex litigation of the sort involved in this case is costly and time-consuming, as demonstrated by previous cases in this circuit involving modifications to retiree benefits.  For example, GM salaried workers and retirees commenced litigation in 1989 challenging the modification of their health care benefits.  The case was resolved nine years later, after a trial and hearing (and rehearing) in the Sixth Circuit.  *See Sprague*, 133 F.3d 388.  Similarly, seven years of litigation were required for the parties in *Yard-Man* to have finality.  *Yard-Man, Inc.*, 716 F.2d at 1482.  The obvious costs and uncertainty of such lengthy and complex litigation weigh in favor of settlement.  *See In re Cincinnati Policing*, 209 F.R.D. 395, 400 (S.D. Ohio 2002) ("[T]he Court has no doubt that the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court....  The prospect of such a massive undertaking clearly counsels in favor of settlement.") (internal quotation marks and citations omitted); *Robinson*, 2005 U.S. Dist. LEXIS 11673, at *14.

32.   Given GM's current financial struggle, the delay necessary to litigate the dispute benefits no one.  For GM, success at litigation may come too late to effect the turnaround that is presented as essential to GM's continued viability.  For the Class, the parties recognize that without a significant reduction in GM's retiree health care costs, the ability of GM to provide health care benefits over the long term to Class Members at or near the level provided by the Settlement Agreement would be placed in jeopardy.

33.   The reasonableness of the parties' judgment that settlement was the appropriate course is supported by evidence of other large industrial employers faced with similar cost pressures.  In  *McCoy*, although plaintiffs obtained a preliminary injunction on the strength of their claim to vested benefits, *see* 390 F.3d at 426, the employer filed for bankruptcy within six months of the Sixth Circuit's decision affirming the preliminary injunction.  *See* Voluntary Petition, *In re Meridian Auto. Sys., Inc.*, No. 05-11168 (Bankr. D. Del. Apr. 26, 2005).  It is that sort of outcome that the representative plaintiffs on behalf of the class reasonably sought to avoid in agreeing to the settlement in this case.

34.   In short, success at litigation (for either side) may prove illusory - - a prospect that makes settlement a reasonable course.  *See In re Rio Hair Naturalizer Prods. Liab. Litig.*, 1996 U.S. Dist. LEXIS 20440, at *40-41 (E.D. Mich. 1996) ("[A] victory by Plaintiffs at trial, given Defendants' limited funds, would be pyrrhic."); *In re Milken & Assocs.*, 150 F.R.D. at 55-56; *Shy*, 1993 U.S. Dist. LEXIS 21291, at *46; see also *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D. Colo. 1974) ("[T]he Court should consider the vagaries of litigation and

24

compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.  In this respect, 'It has been held proper to take the bird in the hand instead of a prospective flock in the bush.'").

### c. The judgment of experienced counsel who have competently evaluated the strength of their proofs.

35.    The endorsement of the parties' counsel is entitled to significant weight, and supports the fairness of the class settlement:  "It is … well recognized that the court should defer to the judgment of experienced counsel who has competently evaluated the strength of the proofs."  *Mich. Hosp. Ass'n v. Babcock*, 1991 U.S. Dist. LEXIS 2058, at *6 (W.D. Mich. 1991); *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *Cotton,* 559 F.2d at 1330 ("[T]he trial court is entitled to rely upon the judgment of experienced counsel for the parties"); *Robinson*, 2005 U.S. Dist. LEXIS 11673, at *15-16; *Berry*, 184 F.R.D. at 104 ("[T]he court generally will give deference to plaintiffs' counsel's determination to settle a case"); MCL (3d) § 30.42; *see also* Newberg § 11.47.

36.    Here, counsel for all parties are reputable practitioners and trial counsel experienced in complex class action litigation.  Under the law, their collective judgment in favor of the Settlement is entitled to considerable weight.  *Ass'n for Disabled Ams.*, 211 F.R.D. at 467 ("[T]he Court must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'") (citation omitted).

### d. The amount of discovery completed and the nature of the evidence uncovered.

37.    In considering whether there has been sufficient discovery to permit the plaintiffs to make an informed evaluation of the merits of a possible settlement, the court should take account not only of court-refereed discovery but also informal discovery in which parties engaged both before and after litigation commenced.  *See Levell v. Monsanto*, 191 F.R.D. 543, 557 (S.D. Ohio 2000) (although little formal discovery was conducted, class counsel retained experts and conducted informal discovery before negotiating the settlement agreement).

38.    Thus, the absence of formal discovery is not unusual or problematic, so long as the parties and the court have adequate information in order to evaluate the relative positions of the parties.  *See Newby*, 394 F.3d at 306 ("'Formal discovery [is not] a necessary ticket to the bargaining table.'"); *Cotton*, 559 F.2d at 1332 (upholding settlement despite fact that little formal discovery had been conducted; "Being an extra judicial process, informality in the discovery of information is desired"); *In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 159 (4th Cir. 1991) ("[D]ocuments filed by plaintiffs and evidence obtained through informal

discovery yielded sufficient undisputed facts" to evaluate the settlement); *Robinson*, 2005 U.S. Dist. LEXIS 11673, at *14-15 (approving settlement without formal discovery); *Woodward v. Nor-Am Chem. Co.*, 1996 U.S. Dist. LEXIS 7372, at *64 (D. Ala. 1996); *In re Armored Car Antitrust Litig.*, 472 F. Supp. 1357, 1369 (N.D. Ga. 1979) (holding "that this material was produced informally and cooperatively is not a failing but is a recommendation for the settlement.").

39.    The court need not possess sufficient "evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation." Newberg § 11:45; *In re Rio Hair Naturalizer*, 1996 U.S. Dist. LEXIS 20440, at *39-40. Instead, the district judge need only have "'sufficient facts before him to intelligently approve or disapprove the settlement.'" *Epstein v. Wittig*, 2005 U.S. Dist. LEXIS 31078, at *23-24 (D. Kan. Dec. 2, 2005); *see Gen. Tire & Rubber*, 726 F.2d at 1084 n.6.

40.    There was full disclosure in this case by GM to the Class and UAW of GM's business and financial condition, including GM's health care liability, and the relevant CBAs and health care plan documents. This is confirmed by both UAW and the Class, each of which selected experts and undertook independent analyses of GM's financial condition and legal position. There was significant information available to the parties to negotiate their compromise, and there is more than an adequate basis and evidentiary record on which the court can assess the parties' agreement.

   **e. The settlement is fair to the unnamed class members.**

41.    Courts may scrutinize settlements to determine whether absent class members have lost out in favor of attorneys and named class members. In this case, the Class is cohesive and the Settlement Agreement affects similarly-situated class members the same. No preference is granted to the Class Representatives under the Settlement and, because all class members have a unitary interest in seeking the best possible benefits for retirees, there is no risk of an undue burden on absent class members. *See, e.g.*, *Heit v. Van Ochten*, 126 F. Supp. 2d 487, 490-491 (W.D. Mich. 2001); 5-23 Moore's Federal Practice § 23.164.

   **f. The relatively few objections raised by class members supports approval of the Settlement.**

42.    "A court should not withhold approval of a settlement merely because some class members object." *Mich. Hosp. Ass'n*, 1991 U.S. Dist. LEXIS 2058, at *10; *Robinson*, 2005 U.S. Dist. LEXIS 11673, at *16; *Reed v. Rhodes*, 869 F. Supp. 1274, 1281 (N.D. Ohio 1994); *Enter. Energy Corp.*, 137 F.R.D. at 246; Fed. Prac. & Proc. § 1797.1 ("[T]he fact that there is opposition does not necessitate disapproval of the settlement."). This is because even though the court must evaluate any objections, it "has an obligation to protect the interests of the silent

26

class majority, despite vociferous opposition by a vocal minority to the settlement." *Mich. Hosp. Ass'n*, 1991 U.S. Dist. LEXIS 2058, at *10.

43.	In this case, fewer than 1,250 out of more than 476,000 class members (less than three-tenths of one percent) have submitted an objection to the settlement agreement.  This minimal level of opposition is evidence of class members' general acceptance and support for the Settlement Agreement.  *See Robinson*, 2005 U.S. Dist. LEXIS 11673, at *17 ("[A] relatively small number of class members who object is an indication of a settlement's fairness") (citing Newberg § 11.48); *In re Cardizem*, 218 F.R.D. at 527 ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *Berry*, 184 F.R.D. at 106 ("[T]he minimal opposition suggests that the class as a whole is in favor of the agreements."); *Lazy Oil Co.*, 95 F. Supp. 2d at 332 ("'[I]n the class action context, silence may be construed as assent.'"); *see also Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (Objections by only 10% of the class "strongly favors settlement"); *Petrovic*, 200 F.3d at 1152 (approving settlement where objectors represented fewer than 4% of the class); *Taifa v. Bayh*, 846 F. Supp. 723, 728 (N.D. Ind. 1994) (class settlement approved despite objections from more than 10% of class).  Several objectors who testified at the fairness hearing averred that they, along with unnamed others of the class, had never received the settlement package and knew "nothing" about the upcoming hearing, learning about it only through news accounts (apparently originated by counsel for the McKnight group of objectors). In view of the undisputed fact that the packages were mailed to the same names and address to which retiree benefits are sent, the court views such averments as these with great scepticism. The court thinks it is far more likely that the recipients who knew "nothing" merely discarded the package of materials without inspecting it.

**g.  The settlement was the product of arm's-length negotiations.**

44.	Courts presume the absence of fraud or collusion unless there is evidence to the contrary.  *In re Rio Hair Naturalizer*, 1996 U.S. Dist. LEXIS 20440, at *15 ("Courts respect the integrity of and presume good faith in the absence of fraud or collusion in settlement negotiations, unless someone offers evidence to the contrary"); *see also Granada Invs., Inc*, 962 F.2d at 1205 ("Absent evidence of fraud or collusion, such settlements are not to be trifled with."); *Hemphill v. San Diego Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2004); Newberg (4th) § 11:51.

45.	There has been no fraud or collusion in this case.  To the contrary, there is an ongoing adversarial relationship between the Class and UAW, on the one hand, and GM, on the other hand, with respect to the question of GM's asserted right to unilaterally change, modify, or terminate health care benefits, and the parties are in fundamental and irreconcilable disagreement on this issue. The evidence

establishes that the settlement was the result of hard-fought negotiations over several months, the exchange and evaluation of information, and the independent review and acceptance of the compromise by all parties. The process was entirely arm's length, with each party representing and pursuing its own interests.

46.   Moreover, if the settlement agreement itself is fair, reasonable and adequate, then the court may assume that the negotiations were proper and free of collusion. *E.g.*, *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 152 (S.D. Ohio 1992) ("In essence, under this test, if the terms of the proposed settlement are fair, then the court may assume the negotiations were proper."), *citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) ("It is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting."); *Hemphill*, 225 F.R.D. at 620; *Land v. United Tel. Southeast, Inc.*, 1997 U.S. Dist. LEXIS 7490, at *5 (E.D. Tenn. 1997); *Woodward*, 1996 U.S. Dist. LEXIS 7372, at *66-67; *see also Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co.*, 834 F.2d 677, 684 (7th Cir. 1987) ("The proof of the pudding was indeed in the eating").

47.   Based on its review of the evidence and submissions, the court concludes that the Settlement Agreement - - which provides comprehensive health care benefits at a modest costs that are below what many other retirees pay for health care coverage - - is fair, reasonable and adequate. Given the absence of any credible evidence showing collusion, this presumption is conclusive in this case.

48.   Finally, in addressing the nature of the negotiations and, in particular, whether they were free of collusion, some courts look to whether (1) the named plaintiffs' claims are treated more favorably than other plaintiffs' claims, and (2) the fee agreement suggests collusion. *See Heit*, 126 F. Supp. 2d at 490-91. There are no such concerns in this case. The claims of the Class Representatives are treated no differently under the Settlement Agreement from the claims of any other Class Member. Class Counsel's fee petition (discussed further below) is remarkably modest for litigation of this nature, based solely on hours worked at a reasonable rate, and not a premium or contingency fee arrangement.

### h.  The public interest.

49.   The evidence more than amply catalogued the impact of GM's continued viability on the economy of southeast Michigan, the State as a whole and, indeed, the nation. For example, the evidence submitted shows that approximately one million Americans earn their livelihood building and selling GM vehicles and another half million retirees in the U.S. depend on GM for their pensions. In addition, GM spends billions of dollars in capital investments, purchases of parts and supplies, and expenditures for research and development. (*Id.* ¶ 18.) GM is Michigan's largest employer, with over 71,000 residents on its payroll, and

28

approximately 165,000 retirees in the area.  (Doc. #1360, Ex. C, Raleigh Decl. ¶ 16.)  All of this economic activity depends on GM's continued viability, which depends in part on GM being able to effectively manage and control its health care costs.

50.   The delay and risks of litigation have an impact not only on GM, UAW, and the Class, but also on the families, businesses, and communities that depend on GM's continued competitiveness and viability.  Those interests are advanced by the Settlement Agreement.  The agreement serves the public interest also by conserving the resources of the parties and the court, and by promoting the "strong public interest in encouraging settlement of complex litigation and class action suits."  *In re Cardizem*, 218 F.R.D. at 530; *see Lipuma v. Am. Express Co.*, 2005 U.S. Dist. LEXIS 38010, at *77 (S.D. Fla. 2005) ("'[S]ettlement will alleviate the need for judicial exploration of these complex subjects, reduce litigation cost, and eliminate the significant risk that individual claimants might recover nothing.'") (citation omitted).

## D.  Objections To The Settlement.

51.   Of the small number of Class Members who have filed an objection to the settlement, approximately two-thirds have stated no reason.  (Doc. #1360, Ex. H, Phillips Decl. ¶ 6)  Because there is no way for the court to determine the basis for these objections or whether any such objections have merit, they are of little use.  *In re Rio Hair Naturalizer*, 1996 U.S. Dist. LEXIS 20440, at *16 ("General objections without factual or legal substantiation carry little weight") (quoting 2 Newberg (3d) § 11.58); *see also Fussell*, 2005 U.S. Dist. LEXIS 30984, at *11-12; *Luevano v. Campbell,* 93 F.R.D. 68, 77 (D.D.C. 1981); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 13954 (D. Ariz. 1989), *aff'd* 955 F.2d 1268 (9th Cir. 1992); *Sunrise Toyota, Ltd. v. Toyota Motor Co.*, 1973 U.S. Dist. LEXIS 14862, at *14 (S.D.N.Y. 1973) (rejecting objections based on conclusory allegations); Fed. Prac. & Proc. § 1797.1 ("Only clearly presented objections…will be considered.").

## 1.  Claim that benefits are vested.

52.   The greatest number of objectors who state any basis for the objection claim that their health care benefits are "vested."  A disagreement over the merits of the parties' dispute, however, is not a basis for disapproving the settlement.  *Laskey v. UAW*, 638 F.2d 954, 956 (6th Cir. 1981) ("[T]he objections made indicated these employees did not want to compromise at all but wanted full benefits, rather than making any complaint directed to the adequacy of their legal representation."); *In re Wash. Pub. Power Supply*, 720 F. Supp. at 1394 (finding that objections based on "fallacious" assumption that "the case assured certain victory for Plaintiffs").

29

53.     Regardless of whether the court were to agree with GM's position or that of UAW and Class with respect to the merits of this lawsuit, the law provides for settlement of even so-called "meritorious" claims, reflecting the fact that settlements are generally based on several different considerations. *In re Am. Bank Note Holographics,* 127 F. Supp. 2d 418, 427 (S.D.N.Y. 2001) ("[W]hile Plaintiffs believe that their claims are meritorious, the fairness and reasonableness of the proposed Settlement in light of the risks, burdens and uncertainties of continued litigation are manifest."); *In re Newbridge Networks Sec. Litig.*, 1998 U.S. Dist. LEXIS 23238, at *6 (D.D.C. 1998) ("Counsel maintain that plaintiffs' legal claims are meritorious, but settlement forestalls the substantial and inevitable uncertainties attendant to proceeding to trial."); *see also Lazy Oil Co.,* 95 F. Supp. 2d at 337 ("'[N]o matter how confident one may be of the outcome of litigation, such confidence is often misplaced.'") (citation omitted).  A significant consideration in plaintiffs' decision to compromise their claims was GM's financial condition, which places in doubt retirees' continued health care benefits - - a condition that would only worsen if plaintiffs were to succeed on their vesting claim. *See Shy*, 1993 U.S. Dist. LEXIS 21291, at *45-46 (rejecting, given defendant's financial condition, objection based on assertion that benefits were vested).  Thus, this objection based on the merits of the parties' claims was (as discussed above) evaluated and weighed in their decision to compromise, and does not provide a basis for disproving the settlement.

## 2.  Retirees were not allowed to "vote" on the Settlement.

54.     The next most common objection is that retirees were not allowed to "vote" on the settlement.  This does not constitute a proper objection, or address any aspect of the settlement.  It also misunderstands the requirements of Rule 23 generally and Rule 23(b)(2) in particular.  A vote by class members is not the means provided by Rule 23(e) for ensuring the fairness of a class action settlement.  Rather, the class members' interests are protected by Rule 23(a)'s requirements such as commonality and adequacy, and by the fact that class members may not be bound to a compromise without independent judicial review to ensure that the proposed settlement is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e)(1)(C).

55.     There is likewise no provision in the UAW Constitution that gives retirees — unlike active employees — a right to vote on the ratification of a collective bargaining agreement.  Hence, the court rejects the objection filed by retiree Pablo Lopez, which asked the court to defer ruling on the adequacy of the settlement pending the outcome of an internal union appeal seeking to overturn the UAW's agreement to the settlement.  Lopez himself acknowledges that the UAW Constitution does not provide for retiree voting, but nonetheless claims that the settlement violates longstanding UAW policy of not agreeing to employer demands for health insurance co-pays and deductibles.  Lopez's assertion about UAW policy raised only a question of the appropriate course of action for the

30

Union under difficult circumstances. It provides no basis for disapproving the Settlement.  Lopez's assertions have, in any event, been rejected by the UAW, which said, in part, that his argument "distorts and misinterprets the action that took place."  *See Decision of UAW International Executive Board,* p.14  [Dkt #1414].

### 3.  Objection that the Class fails to meet the requirements of Rule 23.

56.  Objector McKnight raises a number of challenges to certification of the Class. None of McKnight's contentions undermines the court's conclusion that the Class was properly certified or provides a proper basis to disapprove the settlement.

### *Objections relating to the involvement of UAW*

57.  McKnight asserts, citing *Allied Chem. Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 174 (1971), that the settlement is tainted because of UAW's alleged "prohibitive conflict of interest" as collective bargaining representative of active GM employees.  In *Pittsburgh Plate Glass* the Supreme Court held only that retirees were not "employees" within the meaning of the National Labor Relations Act, and that an employer therefore had no legal duty to bargain with the union over the benefits of workers who were already retired.  *Pittsburgh Plate Glass* does not hold that a union cannot adequately represent a class of retirees in a class action.  Moreover, even as to collective bargaining, the Court emphasized that, if the employer agreed, a union could bargain on behalf of its retirees.  *Id.* at 181 n.20.

58.  The Sixth Circuit and other courts have since held that a union may negotiate for, and assert rights on behalf of, retirees.  *E.g., Yard-Man, Inc.,* 716 F.2d at 1486; *Communications Workers v. Mich. Bell Tel. Co.,* 820 F.2d 189, 192 (6th Cir. 1987) ("[T]he union had standing to assert the retirees' rights under the [CBA] to which it was a party."); *Rossetto v. Pabst Brewing Co.,* 128 F.3d 538, 540 (7th Cir. 1997); *United Steelworkers v. Canron, Inc.,* 580 F.2d 77, 80-81 (3d Cir. 1978); *UAW v. Acme Precision Prods., Inc.,* 515 F. Supp. 537, 540 (E.D. Mich. 1981).  UAW has historically taken the position that it can represent retirees and has, in fact, done so.

59.  In this case, UAW entered into negotiations with GM with the aim of reaching a settlement that would, in a way that was fair to both retirees and active employees, provide GM with a level of cost savings that would increase the likelihood that it could survive and continue to pay promised benefits in the future.  As UAW's representative explained, the Union negotiated a framework for settlement:

> "Because the best information available told us that in the near future, UAW active employees and retirees were at risk of losing the retiree

medical benefits that the UAW had fought to obtain over the last sixty years. The Union thought long and hard about how to avoid decreasing retiree benefits at all, but was ultimately confronted by the fact that there are 472,000 retirees, surviving spouses, and dependents, but only 110,000 active workers. The only way we could protect retirees' long-term interests was by negotiating a limited reduction of retiree health care benefits, mitigated by a much larger and mounting contribution of wages and COLA increases from active workers."

Contrary to McKnight's contention, the framework and resulting agreement was more advantageous to the retirees than any agreement negotiated solely on their behalf without UAW's involvement possibly could have been.

60.   In particular, McKnight's assertion that the settlement is skewed in favor of active employees overlooks two critical points. First, the changes in retiree health benefits provided for under the settlement will apply fully to all currently active employees upon their retirement, just as they do to already retired employees. The active employees, in other words, are accepting the very same changes in their collectively bargained retiree health care as are the currently retired employees. *See Shy*, 1993 U.S. Dist. LEXIS 21291, at *47-48 (rejecting similar objection where settlement provided that active employees would be subject to the same benefit modifications upon retirement). This is particularly significant in view of the fact that one-third of GM's UAW-represented workforce is already eligible for retirement.

61.   Second, while most of the changes in retiree health-care benefits are not being applied to the benefits of currently active employees, the active employees are contributing to the settlement in another way that is both more costly for them and more beneficial to the retirees — by giving up an average of $2,000 per active employee per year in wages in order to help fund the DC-VEBA that mitigates the contributions retirees must make to their health care. These wage concessions far outstrip the costs of $370 per year for single coverage or $752 for family coverage (plus prescription co-pays) that retirees will initially be required to pay under the Modified Plan. The present value of active workers' wage contributions to the VEBA over the next 20 years is just over $4 billion, compared with the $2.1 billion present value of the additional retiree payments in contributions, deductibles, coinsurance, and drug copayments expected to be made by retirees over the next 20 years.

62.   McKnight also objects that UAW decided to negotiate concessions on retiree health benefits during 2005 for the purpose of improving its negotiating position on behalf of active employees when its collective bargaining agreement expires

in 2007.  In making this assertion, McKnight relies upon a report prepared by UAW's financial advisor, Lazard, and filed under seal, which discusses the relative advantages of negotiating health care benefits immediately rather than in 2007 at the expiration of the current collective bargaining agreement.  There is no factual basis, however, for McKnight's speculation  that Lazard's comments were aimed at advancing the interests of active employees rather than retirees.  The record is to the contrary.  It demonstrates that Lazard's recommendations were pursuant to its engagement to advise UAW on alternatives that would be most beneficial to retirees.

## Objections relating to adequacy of Class Counsel/purported conflicts of interest.

63.   McKnight asserts that there is a fundamental conflict of interest in this case between the interests of UAW/active employees and retirees.  It is not UAW or its counsel that represents the Class of retirees.  Although  the settlement framework was negotiated by UAW, it was Class Counsel who subsequently made the independent judgment that the settlement was in the interest of the Class, adopted the settlement framework, participated as an equal party in finalizing the Settlement Agreement, and on behalf of the Class seeks approval of the Settlement Agreement.  Separate representation of the class provides a "structural protection of independent representation," *Ortiz*, 527 U.S. at 855; *see Amchem*, 521 U.S. at 627, which avoids any purported antagonism between retirees and active employees. *Cf. In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 359, 372 (N.D. Ohio 2001) (separate representation provides "'structural assurance of fair and adequate representation'" that "cure[s]" alleged antagonisms within class); *see also Ralston v. Zats*, 2000 U.S. Dist. LEXIS 16377, at *9-10 (E.D. Pa. 2000); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 425 (S.D. Tex. 1999) ("[T]he fact that separate attorneys negotiated on behalf of subclasses with distinct legal claims reasonably and adequately protected the interests of the class.").

64.   Class Counsel's lack of participation in the initial settlement framework does not render their representation inadequate.  In the absence of a disabling conflict, Class Counsel can evaluate whether their participation in crafting the ultimate compromise agreement was sufficient to protect their clients' interests and to seek additional participation (or refuse approval) if it were not.  *See Brown v. Am. Home Prods. Corp.*, 2000 U.S. Dist. LEXIS 12275, at *135-36 (E.D. Pa. 2000) (counsel was "qualified to make assessments of the extent to which he or she needed to be involved in the negotiations").  Nothing in Rule 23 "requires that … counsel fight among one another or attend every negotiation session." *Id.* at *159-62.  In short, regardless of UAW's wishes, there could and would have been no settlement of this litigation without the independent decision of counsel appointed by this court to represent the Class to enter into the settlement.

65. That the settlement framework was worked out in months of negotiations before the filing of this lawsuit does not show that Class Counsel was inadequate. Settlement classes are a recognized vehicle for resolving class litigation and, so long as Rule 23's requirements are met, are properly certified even when the claims are settled before the complaint is filed. *See*, *e.g.*, *Amchem*, 521 U.S. at 618 ("[T]he 'settlement only' class has become a stock device"); *In re Am. Family Enters.*, 256 B.R. 377, 413 (D.N.J. 2000) ("The legitimacy of a settlement class was ... confirmed by the Supreme Court in Amchem…"); *Clark Equip. Co.*, 803 F.2d at 881; *Robinson*, 2005 U.S. Dist. LEXIS 11673, at *3 (approving settlement filed at the same time as complaint); *In re Cincinnati Policing*, 209 F.R.D. 395, 398 (S.D. Ohio 2002); *Shy*, 1993 U.S. Dist. LEXIS 21291, at *17; *Bowling*, 143 F.R.D. at 150; MCL § 21.132 (4th ed. 2004).

66. McKnight takes issue with Class Counsel's reliance on the report prepared by the financial advisor hired by the Class, Gleason & Associates.  Although McKnight had access to the same documents and financial information reviewed by the Class and UAW and their respective advisors, he points to nothing in the Gleason report that is in any way inaccurate.  McKnight has also provided no reason or evidence why Class Counsel was not entitled to rely on their advisor's report, which was consistent with the conclusions regarding GM's financial predicament reached by Lazard, and by Class Counsel's own review of financial documents.

67. McKnight objects that the Class's financial advisor should have independently evaluated the long-term prospects of the DC-VEBA.  This is without merit.  The record includes an affidavit and report describing the conclusions reached by Milliman, one of the largest consulting and actuarial firms in the United States, as a result of its exhaustive actuarial analysis of the viability of the DC-VEBA.  In early December 2005, before any Settlement was entered into on behalf of the class, Class Counsel reviewed with UAW representatives the analysis conducted by Milliman.  McKnight provides no factual basis for discounting the Milliman report or any reason why Class Counsel's reliance on it was improper.  McKnight also failed to offer any evidence that disputes, let alone contradicts, the conclusions of the Milliman analysis.

68. McKnight asserts that Class Counsel failed to adequately represent the interests of the Class because they did not "improve the position of retirees" in the settlement.  Notably, McKnight does not demonstrate that a better deal was possible, particularly given that the modest cost increases to retirees under the Settlement is dependent upon wage concessions secured by the efforts of UAW. Thus, had Class Counsel elected to reject the Settlement, as now urged by McKnight, persuading GM to accept new terms was not the only hurdle they

34

would have faced.  Given the substantial sacrifices that active employees had been asked to make, there was no certainty that they would have approved a different deal, or even the same deal, had it been presented to them again.

69.   Class plaintiffs claim that their health care benefits are vested and thus "share the same ultimate objective" as McKnight, namely, to preserve those benefits. *United States v. Michigan*, 424 F.3d 438, 444 (6th Cir. 2005); *Bradley v. Milliken*, 828 F.2d 1186, 1192 (6th Cir. 1987); *In re Prudential Ins. Co.*, 148 F.3d at 313 (adequacy existed where all class members challenged the same practices). Class Representatives' and Counsels' decision to compromise rather than put their benefits at risk by litigating the dispute does not show that their representation is inadequate.  *E.g., United States v. City of New York*, 198 F.3d 360, 367 (2d Cir. 1999) ("Representation is not inadequate simply because 'the applicant would insist on more elaborate … pre-settlement procedures or press for more drastic relief'" or has "different views on the facts, the applicable law, or the likelihood of success of a particular litigation strategy."); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 491 (S.D.N.Y. 1998) (Where objectors' "only evidence of inadequate representation is that class counsel negotiated a settlement of which he does not approve," this issue can be addressed through the court's consideration of objections to the fairness of the settlement).

70.   McKnight's objections to the settlement terms to which the Class Representatives agreed are insufficient to show inadequate representation under Rule 23.  *See, e.g., DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1175 (8th Cir. 1995) ("The fact that the Crehans do not approve of the settlement terms does not, of itself, demonstrate that [named plaintiff] and class counsel provided inadequate representation.  To hold as much would require decertification any time an objection is raised to a class, certainly not the standard envisioned by Rule 23."); *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1241 (9th Cir. 1998) ("[M]erely pointing out that there were some class members who objected to the settlement is not enough to show that the representatives were inadequate."); *see Bradley*, 828 F.2d at 1192 (6th Cir. 1987) ("A mere disagreement over litigation strategy or individual aspects of a remediation plan does not, in and of itself, establish inadequacy of representation.").

**_Objections based on Ortiz v. Fibreboard Corp._**_, 527 U.S. 815 (1999) and **Amchem**_
**_Prods., Inc. v. Windsor_**_, 521 U.S. 591 (1997)_

71.   McKnight reiterates the argument found in his "Motion for Reconsideration," based on *Ortiz* and *Amchem Prods., Inc.,* that when a class is certified for settlement purposes certain issues as to the fairness of the settlement must be

addressed in an evidentiary hearing at the time of preliminary approval of the settlement rather than at the Rule 23(e)(1) fairness hearing.

72.   This court has already addressed this objection in denying McKnight's motion for reconsideration.  *Ortiz* does not control in this matter as that case "applied to limited fund actions brought under Federal Rule of Civil Procedure 23(b)(1)(B)," and "involved tremendous intraclass conflicts that McKnight has not shown to be present here, as the present class is made up entirely of retirees."  The requirement in *Ortiz* for precertification evidence of the existence of a "limited fund," has no application and does not undermine class certification in this case.

73.   The parties' decision to take account of and provide protection for the most financially vulnerable Class Members based on pension income is not an impediment to approval of the Settlement.  On the contrary, "'there is no rule that settlements benefit all class members equally,'... as long as the settlement terms are 'rationally based on legitimate considerations.'"  *In re Painewebber Ltd. Pshps. Litig.*, 171 F.R.D. 104, 131 (S.D.N.Y. 1997) (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1411 (E.D.N.Y. 1985)); *see, e.g., In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 n.14 (S.D.N.Y. 2004); *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 493 (E.D. Pa. 2003).  Limiting benefits changes and costs for retirees with smaller pensions is a reasonable and legitimate consideration.  This Class is cohesive and free of conflicts and all Class Members share an interest in maintaining health care benefits.  *See Kamen*, 908 F.2d at 1350; *Edmondson*, 86 F.R.D. at 381.  (*See also* Conclusions of Law, *supra*.)  The parties could legitimately agree that the best way to preserve the highest level of health benefits for the most Class Members was to limit changes and costs for those Members for whom such changes and costs would have a greater financial impact.

74.   Indeed, at the Fairness Hearing, no objection was made to the Protected Retiree provision of the Settlement Agreement.  And while counsel for objector McKnight speculated that the Class could have other possible stratifications, he offered no alternative to the decisions made by the parties in the Settlement Agreement, conceding instead that "it's not necessary that the proponents present to the Court the best settlement."  (March 6, 2006 Hearing Tr. at 74)

### 4.  Attorneys Fees Were Not Improperly Awarded.

75.   McKnight also contends that the court "summarily granted" Class Counsel's fee request in violation of Fed. R. Civ. P. 23(h)(2).  Consistent with the Rule 23(h)(1) requirement that class members be advised  in a reasonable manner of any fee

application by class counsel, the class notice here advised all class members of the fee request:

> "Class Counsel's application and brief supporting the fee award will be filed with the Court within two weeks of your receipt of this Notice and any Class Member's objections may address the proposed fee award, as well as any other part of the proposed settlement."

76. In accordance with the Notice, Class Counsel filed an initial motion for attorneys' fees and expenses on January 17, 2006.  By Order dated January 31, 2006, the court approved the hourly rates sought by Class Counsel and found their provisional estimate of projected fees to be reasonable.  The court directed that further proceedings could be held after judgment once counsel had supplemented their initial motion.  With approval of the Settlement, Class Counsel must supplement their initial motion, and those further proceedings will ensue.  None of this is a basis on which to disapprove the Settlement.

### 5.  The Settlement Does Not Violate The Federal Age Discrimination In Employment Act ("ADEA").

77. McKnight contends that Settlement Agreement's provisions for coordination of benefits with Medicare violate the Age Discrimination in Employment Act ("ADEA").  The court disagrees. The administrative changes to which McKnight refers provide that the portion of benefits payable by Medicare to Medicare-eligible retirees will be paid by Medicare, while GM will pay any remaining portion of the benefits, whether the employee is Medicare-eligible or not.  (*See* Doc. #27, Ex. 1, Settlement Agreement, Ex. 1, at 1-2)  This is, in the industry jargon, a "wrap" benefit plan, in which coverage is the same for retirees older and younger than age 65, although for Medicare-eligible employees part of the benefit is paid by Medicare rather than by the employer.  Such programs provide "equal benefit" to the employee, 29 U.S.C. § 623(f)(2)(B)(i), and are permitted under the ADEA, notwithstanding that the cost to the employer for Medicare-eligible and non-Medicare-eligible employees is not the same:

> An employer does not violate the Act by permitting certain benefits to be provided by the Government, even though the availability of such benefits may be based on age.  For example, it is not necessary for an employer to provide health benefits which are otherwise provided to certain employees by Medicare.

29 C.F.R. § 1625.10(e); *see also Erie County Retirees Ass'n v. County of Erie*, 220 F.3d 193, 216 (3d Cir. 2000) ("In accordance with 29 C.F.R. § 1625.10(e), the 'equal benefit' prong of the analysis should take into account equally both the Medicare-provided and the [employer]-provided benefits which members of the plaintiff class receive.").

### 6. The "Hold Harmless" Provision.

78.   Under the existing health care Program that applies to both active employees and retirees, if an enrollee receives services from a "nonparticipating" provider - - *i.e.*, one that is not in the carrier's network and has not agreed to accept contract rates as full payment - - the Program will reimburse that provider up to the "reasonable and customary" amount charged by participating physicians.  The carrier will defend that amount against a provider's claims against an enrollee for additional charges, unless the enrollee has entered an agreement with the provider regarding the charges.

79.   McKnight objects to a provision in the Settlement Agreement that modifies this "Hold Harmless" provision by removing the carrier's obligation to defend the "reasonable and customary" charges.  McKnight alleges that this modification could cost a retiree "thousands of dollars."  As an initial matter, an objection to a single provision does not warrant rejection or disapproval of the Settlement Agreement itself.  Class settlements are to be "taken as a whole" and evaluated in their entirety.  *Clark Equip. Co.*, 803 F.2d at 88.  If the agreement as a whole "'falls within the range of reasonableness,'" *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 319, given the risks and uncertainties of litigation, it will be approved.

80.   In addition, however, McKnight ignores that under the plain terms of the Settlement Agreement, the enrollee will not be responsible for any additional charges if the enrollee did not have the ability to select a participating (*i.e.*, "par") provider to perform the services:

> The enrollee will be responsible for all fees charged above R&C, unless the enrollee is in a situation in which the enrollee does not have the ability or control to select a par provider to perform the service.

For example, if the enrollee undergoes surgery at a participant hospital with a participant physician, but a member of the surgical team, such as the anesthesiologist, is a non-participant, the enrollee would not be responsible for any additional charges by that nonparticipating member of the team.  Members may also avoid extra charges for an out-of-network provider by first obtaining a referral.  And by obtaining an "out-of-area waiver," members without appropriate geographic access to an in-network primary care provider, obstetrician/gynecologist, or pediatrician may, without additional out-of-pocket expense, receive care from an out-of-network provider.

38

81.     McKnight's objection that a particular anesthesia group, for example, is purportedly not in the provider network, is irrelevant and does not show that enrollees will be faced with any increased costs whatsoever, let alone the "large bills" about which McKnight speculates.  Similarly, the Declaration of Dr. Steven Katz, which McKnight submitted, ignores these safeguards and thus much of his speculation - - for example, that "patients … may have less access to a highly experienced orthopedic surgeon because … the anesthesia group the surgeon works with is not in the plan network" - - is simply erroneous.

82.     Likewise, Dr. Katz does not attempt to connect any of his opinions to the facts of this case - - such as the actual Plan coverage, comprehensive provider networks, including available specialists (and their costs), or the GM retiree population - - and thus his statements about the "potential" effect of the Settlement and what "may" happen to a "presumed" "patient population" "if" certain unverified conditions occur are entirely speculative, and thus unreliable and unhelpful to the analysis.  *See*, *e.g.*, *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) ("Given the absence of meaningful analysis or reasoning, the district court acted well within its discretion by discarding the … affidavit.") (citations omitted); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (affirming exclusion of expert testimony that lacked sufficient grounding in facts) (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)); *Freeport-McMoran Res.  Partners Ltd. P'ship v. B-B Paint Corp.*, 56 F. Supp. 2d 823, 834 (E.D. Mich. 1999) (striking affidavit where expert "proffered nothing except his 'experience' to support his conclusions").

83.     In sum, what McKnight objects to are enrollee costs associated with the use of pre-approved fee structures and agreements with participating providers that, by definition, restrict enrollees' choices by imposing costs on their decisions to go out-of-network.  This limitation, however, is a well-established feature and, indeed, the foundation of various health care plans currently available throughout the U.S., such as Indemnity Plans, Preferred Provider Organizations ("PPOs"), and Health Maintenance Organizations ("HMOs").  Given its wide acceptance as a reasonable feature of plans featuring pre-approved fee structures, this modification provides no basis for disapproving the Plan.  *See Shy*, 1993 U.S. Dist. LEXIS 21291, at *11 ("It is neither required, nor is it possible for a court to determine that the settlement is the fairest possible resolution of the claims of every individual class member; rather, the settlement, taken as a whole, must be fair, adequate and reasonable.") (citing *Clark Equip.  Co.*, 803 F.2d 878).

39

**7.  There Are No Due Process Problems With The Rule 23(b)(2) Class.**

84.    McKnight contends that "this settlement takes away money to which the retirees otherwise would have a claim," and that, "absent a right to opt out, this is a problematic trial waiver without consent" under the Seventh Amendment. McKnight argues that "[w]hile a claim for benefits under ERISA does not carry the right to trial by jury, the claims that each class member has for enforcement of the collective bargaining agreement do."

85.    Plaintiffs' Complaint, however, is an "action for a declaratory judgment" seeking declaratory and injunctive relief under ERISA § 502(a)(1)(B) & (a)(3) and § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

86.    Moreover, given that this action was filed before GM made any changes to retiree benefits, and plaintiffs do not allege that their benefits have in any way been reduced or modified, there can be no possible claim for monetary relief, making certification of Plaintiffs' LMRA and ERISA claims proper under Rule 23(b)(2).  *See, e.g.*, *Berger v. Xerox Corp. Ret. Income Guar. Plan*, 338 F.3d 755, 763-64 (7th Cir. 2003) (affirming Rule 23(b)(2) certification of declaratory judgment claim by pension plan participants "'to recover benefits'" under ERISA § 502(a)(1)(B)); *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1105-06 (5th Cir. 1993); *Reese v. CNH Am. LLC*, 227 F.R.D. 483, 489 (E.D. Mich. 2005) (certifying declaratory ERISA and LMRA claims under Rule 23(b)(2)).  Indeed, in his own proposed complaint submitted in support of his motion to intervene in this action, McKnight contends that the claims at issue can be properly maintained as a class action under Rule 23(b)(2).

87.    McKnight's assertion that the court "has discretion to permit opt-outs" in a Rule 23(b)(2) class and that this issue should have been raised by Class Counsel likewise provides no basis to disapprove the Settlement.  Any discretionary provision of opt-out rights under Rule 23(b)(2) is appropriate only in "hybrid cases" in which both money damages and injunctive relief are sought, or where "individual class members may be able to make even stronger claims based on their own individual circumstances."  *Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 593, 603 n.26, 605 (E.D. Mich. 1996) (alleging, in addition to an ERISA claim, a RICO claim for money damages).  In contrast, the Class here has a "common claim" - - *i.e.*, that their benefits are vested - - which "is susceptible to a single proof and subject to a single injunctive remedy," and no possible claim for money damages.  *Senter*, 532 F.2d at 525; *Coleman v. GMAC*, 220 F.R.D. 64 (M.D. Tenn. 2004); *McGee v. E. Ohio Gas Co.*, 200 F.R.D. 382, 391 (S.D. Ohio 2001) (where "the putative class seeks a judgment 'settling the legality of the

behavior with respect to the class as a whole,'" Rule 23(b)(2) certification is proper) (quoting Fed. R. Civ. P. 23 advisory committee's note).

88.    Permitting class members to opt out from this homogenous and unified class would necessarily mean that different retirees could have different rights under the same GM health care plan, making effective declaratory or injunctive relief - - as well as administration of benefits under the Settlement - - impossible.  *See Van Gemert v. Boeing Co.*, 590 F.2d 433, 439 (2d Cir. 1978); *Day v. NLO*, 851 F. Supp. 869, 885 (S.D. Ohio 1994) ("Opting out is generally not reasonable because plaintiff-by-plaintiff injunctive relief is not practical.").  It would also "'permit the institution of separate litigation and would defeat the fundamental objective of (b)(2), to bind the members of the class with one conclusive adjudication,'" undermining the efficacy of any settlement.  *Kyriazi v. W. Elec. Co.*, 647 F.2d 388, 393 (3d Cir. 1981) (quoting *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 252-53 (3d Cir. 1975)); *Ass'n for Disabled Ams., Inc.*, 211 F.R.D. at 473 (same).

89.    In the absence of individual claims for monetary relief, allowing opt outs is not only unnecessary, but would destroy the very basis of the Class' claims and requested relief, as well as the purpose of any class treatment.  *Stewart v. Rubin*, 948 F. Supp. 1077, 1090 (D.D.C. 1996) (Rule 23(b)(2) is "designed specifically to avoid the risks of inconsistency, prejudice, or inequity that would result to persons similarly situated in the absence of a unitary adjudication of their common claims.");  *Heit v. Van Ochten*, 2001 U.S. Dist. LEXIS 532, at *4 (W.D. Mich. 2001); *see Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1240 (9th Cir. 1998) (holding that class counsel was not inadequate for failing to insist on opt-out rights where claims were predominantly for monetary relief).

### 8.  Class Notice Was Adequate.

90.    Rule 23(e)(1)(B) requires that Class Members be given notice of a proposed settlement that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  The notice "must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings.'"  *Grunin v. Int'l House of Pancakes, Inc.*, 513 F.2d 114, 122 (8th Cir. 1975) (quoting *Philadelphia Housing Auth. v. Am. Radiator & Standard Sanitary Corp.*, 323 F. Supp. 364, 378 (E.D. Pa. 1970), *aff'd*, 453 F.2d 30 (3d Cir. 1971)).

91.     The  notice approved by this court on December 22, 2005, and mailed to the
        nearly half a million members of the Class immediately thereafter, meets this
        standard.  Not only did the notice explain the background of the litigation and
        summarize the terms of the proposed settlement, including the right of Class
        Members to object, but the notice package also included a complete copy of the
        Settlement Agreement.

92.     McKnight's objection to the notice consist largely of complaints that the notice
        failed to adopt McKnight's own interpretations of the litigation and the Settlement,
        or that it did not highlight certain terms that McKnight deems important.  A
        summary, by its nature, cannot discuss every term of the agreement. That is why
        the Settlement Agreement itself was not simply made available upon request but
        actually included with each notice.  It is inevitable that some details will be
        omitted from a notice, but "[t]he fact that the notices do not fully explore [certain
        issues] is immaterial.  Class members are not expected to rely upon the notices
        as a complete source of settlement information . . . .  Any ambiguities regarding
        the substantive aspects of the settlement could be cleared up by obtaining a
        copy of the agreement . . . ."  *Grunin*, 513 F.2d at 122.  That Class Members in
        this case received the full Settlement Agreement as part of the notice deprives
        McKnight's attempt to find flaws in the notice of any force whatever.  *See
        Weinberger*, 698 F.2d at 70-71 ("Those who wanted to probe more deeply could,
        as the notice plainly told them, examine 'the settlement stipulation and the
        papers and documents filed in this action.'").

93.     Other objections raised by McKnight are simply wrong as a factual matter.  For
        example, according to McKnight, "not mentioned anywhere in the Notice form…is
        the settlement provision eliminating 'hold harmless' protection" relating to Class
        Members' responsibility for fees above the reasonable and customary charge for
        health care services provided by a non-participating physician.  On the contrary,
        the Notice specifically describes "Administrative Changes" in the Modified Plan
        that include, among other things, "limitations on GM's responsibility for all fees
        charged above those reasonable and customary," and further states that "[m]ore
        information concerning Administrative Changes is set forth in Exhibit 1 to the
        Settlement Agreement."

94.     McKnight also speculates that "it appears that the Notice was not received by
        many class members," citing to a declaration from a single Class Member (Thurlo
        Smith), which states that Mr. Smith and an unspecified number of retirees
        residing in his retirement community did not receive a Notice package.  It is
        undisputed that the notice in this case was mailed directly via First Class Mail to
        each member of the Class and published in the *Detroit News & Free Press* and
        *USA Today*.  The direct notice mailings were based on the master list used to

42

administer all GM employee benefit plans, including for hourly retirees, and the number of notice packets returned by the U.S. Postal Service with no forwarding address was very low compared with the undeliverable rate range in other approved class settlements.  The court rejects McKnight's speculation about lack of receipt by "many class members."

95.    Even to the extent that it is true that some class members failed to receive the notice, the methodology is not thereby indicted, since the method of providing notice is not unreasonable merely because it is not perfect.  "Courts have consistently recognized that due process does not require that every class member receive actual notice so long as the court reasonably selected a means likely to apprise interested parties."  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 231 (D.N.J. 1997); *see, e.g.*, *Weigner v. New York*, 852 F.2d 646, 651 (2d Cir. 1988) ("Due process does not require that notice sent by first-class mail be proven to have been received."); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).  Likewise, "Rule 23 does not require the parties to exhaust every conceivable method of identifying the individual class members."  *In re Prudential Ins. Co.*, 177 F.R.D. at 232; *see Weinberger*, 698 F.2d at 71 (rejecting the contention that the mailing of individual notice to the last known address of all class members was inadequate).  Instead, "[t]he notice of the Proposed Settlement, to satisfy both Rule 23(e) requirements and constitutional due process protections, need only be reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections."  *In re Prudential Ins. Co.*, 177 F.R.D. at  231.

96.    Notice by direct mail satisfies due process, even when it is not combined with publication notice as in this case.  *See, e.g., Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 489 (1988) ("We have repeatedly recognized that mail service is an inexpensive and efficient mechanism that is reasonably calculated to provide actual notice"); *Weigner*, 852 F.2d at 650 ("[T]he Supreme Court has consistently held that mailed notice satisfies the requirements of due process.") (citing cases); *Uhl v. Thoroughbred Tech. & Telecomms. Inc.*, 2001 U.S. Dist. LEXIS 13115, at *63 (S.D. Ind. 2001) ("[T]he law requires 'adequate notice,' not perfect notice, and mailings have served the notice requirement since Mullane.").  That a small fraction of the total class may have not received mailed notice does not indicate any problem with the parties' notice methodology.  *See, e.g.*, *Weigner*, 852 F.2d at 651; *Torrisi*, 8 F.3d at 1375.

97.    The method of notice used in this case, publication and direct First Class Mail based on the GM master mailing list, fully meets the definition of "reasonably calculated, under all of the circumstances, to apprise interested parties of the

43

pendency of the settlement proposed and to afford them an opportunity to present their objections," *In re Prudential Ins. Co.*, 177 F.R.D. at 231, and clearly satisfies the standards of due process. *See Silber v. Mabon*, 18 F.3d 1449, 1451-52 (9th Cir. 1994); *Weinberger*, 698 F.2d at 61, 69-71; *In re Four Seasons Sec. Laws Litig.*, 58 F.R.D. 19, 32 (W.D. Okla. 1972).

98.   In connection with his objection to notice, McKnight submitted the Declaration of Katherine Kinsella, which opines that the notice in this case "does not fulfill the plain language requirement intended by" the 2003 revision to Rule 23(c)(2).  As an initial matter, this ignores the fact that the Notice packet mailed to Class Members included not just the Class Notice, but also a two-page explanatory cover letter signed jointly by Class Counsel and UAW (the "Cover Letter") and a copy of the full 80-page Settlement Agreement.   The inclusion of the Settlement Agreement and Cover Letter - - which is not ordinarily done in class action settlements - - makes this notice program more comprehensive and helpful to Class Members than most other notice programs.

99.   Further, the Notice itself is easily understood, succinctly and accurately summarizes the terms of the Settlement Agreement, and informs Class Members of their rights.  This is all that the law requires, and more than satisfies the standards of Rule 23(e) as well as Rule 23(c)(2).  *See In re Cement & Concrete Antitrust Litig.*, 817 F.2d 1435, 1440 (9th Cir. 1987) ("Notice is satisfactory if it 'generally describes the terms of  the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'") (citation omitted); *In re Baan Co. Sec. Litig.*, 284 F. Supp. 2d 62, 67 (D.D.C. 2003).

## 9.  McKnight's Remaining Objections.

100.   McKnight reasserts his objections that the court lacked subject matter jurisdiction and erred in denying his motion to intervene.  The court has ruled upon these arguments in its order denying McKnight's motion to intervene and as McKnight has not asked the court to reconsider that order (nor offered any basis for doing so), the court need not and will not reexamine that issue.

## 10.    Objection That The DC-VEBA May Become Insolvent.

101.   Some objectors have expressed concern that the DC-VEBA might become insolvent, but have provided no analysis or evidence to support their suggested concern.  Moreover, the analysis of the DC-VEBA by UAW's actuarial consultant

shows that, based on available information, this is not a serious threat for the foreseeable future.  Counting only GM's cash contributions and required profit sharing contributions, as well as the wage deferrals by active employees - - and excluding all other sources of VEBA funding that are contingent on an improvement in GM's financial condition - - UAW's actuarial consultant Milliman concluded that "the DC VEBA is projected to have sufficient assets over a twenty year period to provide for the level of mitigation payments anticipated in the current settlement agreement."  No evidence or materials to the contrary have been submitted to the court.

102.   Moreover, that the ability of the assets of the DC-VEBA to mitigate retiree health care costs is not guaranteed is not a reason for rejecting the Settlement Agreement.  The DC-VEBA exists to mitigate costs that are otherwise reasonable in comparison with costs paid by older retirees nationally.  Moreover, like any investment, the performance of the DC-VEBA is subject to numerous factors that cannot be predicted with certainty.  In fashioning a compromise, the parties are entitled to allocate the risk of investment performance among themselves.

### 11.  Other Objections to the Settlement.

103.   The remaining objections assert (i) unfairness or individual hardship, (ii) that objectors should have had more time to evaluate the settlement; (iii) that the financial problems were caused by (and/or the consequences should borne by) GM management, or (iv) otherwise take issue with particular features of the settlement.  The court is mindful of the retirees' concerns and the hardships that cost increases *may* cause to certain individuals.  However, the parties have endeavored to design a plan that provides continued comprehensive coverage at a moderate cost that will be affordable to most, if not all, class members.  Moreover, the court cannot ignore that the alternative to settlement - - the risks of continued litigation and GM's financial condition - - will likely be worse for the retirees.  *See Shy*, 1993 U.S. Dist. LEXIS 21291, at *49-50.

104.   Second, the court concludes that the time for submitting objections, more than seven weeks after notice, was adequate to provide class members a meaningful opportunity to raise their objections.  *See*, *e.g.*, *Williams v. Vukovich*, 720 F.2d 909, 920-21 (6th Cir. 1983) ("[t]wo weeks would appear to be the minimum" between notice to class of proposed consent decree, which is "essentially a settlement agreement," and the reasonableness hearing); *see also Brotherton v. Cleveland*, 141 F. Supp.2d. 894, 904 (S.D. Ohio 2001) (approving settlement); *In re Bankamerica Corp. Secs. Litig.*, 210 F.R.D. 694, 708 (E.D. Mo. 2002) (approving settlement where class members had three to four weeks to object and collecting cases with similar time periods).

45

105. Third, "whether or not [defendant's] management operated poorly in the past is simply not relevant to the issues presently before the Court."  *Shy*, 1993 U.S. Dist. LEXIS 21291, at *45 (S.D. Ohio 1993).  In addition, while not determinative of whether the Settlement Agreement itself is fair and reasonable, such objections disregard the undisputed fact that GM's turnaround plan also impacts and requires contributions from others at GM, including the company's officers, management, board of directors, salaried employees, salaried retirees, active hourly employees and shareholders.

106. Finally, the court has considered and evaluated the remaining objections filed in the record and concludes that they offer no basis for disapproving the settlement. In this regard, the court must note that, while some few class members suggested alternative terms for the Settlement, and although the court could envision alternate "stratification" terms of its own, the issue before the court is not whether the settlement might be more advantageous to certain class members if discrete settlement terms were changed.  *See Shy*, 1993 U.S. Dist. LEXIS 21291, *11.  Rather, "[i]n considering the extent and significance of the objections, 'the Court must view the agreement in its entirety, rather than isolating individual components of the agreement for analysis.'"  *Robinson*, 2005 U.S. Dist. LEXIS 11673, at 16-17; *Mich. Hosp. Ass'n*, 1991 U.S. Dist. LEXIS 2058 at *11-12.  Accordingly, the various objections to particular terms of the Settlement - - representing the individual views and particular circumstances of less than four-hundredths of one percent of the Class - - cannot overrule the views of the overwhelming majority of the Class, nor the court's determination that the settlement is fair, reasonable and adequate, and should be approved.

## F.  Motion for Fees And Expenses.

107. On January 31, 2006, the court ruled in connection with Class Counsel's January 17, 2006 motion for fees and expenses that Class Counsel's requested hourly rates were appropriate.  The court also ruled that "further proceedings concerning fees and costs may be held after counsel supplement their motion 14 days after judgment," and that the court's findings and conclusions concerning that motion were "to be supplemented after counsel supplement their motion 14 days after judgment pursuant to Rule 54(d)(2)."  Accordingly, pursuant to Settlement Agreement § 20.B and given the size of the settlement and the extensive legal work performed, the court approves a request for reasonable fees and expenses by Class Counsel, and will determine the exact amount of such fees and expenses after a motion made within 14 days pursuant to Rule 54(d)(2). Similarly, the UAW is to file its motion for reasonable attorney and professional fees, also pursuant to § 20.B of the Settlement Agreement, within 14 days after judgment pursuant to Rule 54(d)(2), and the court will rule on UAW's motion at

46

that time.  The amounts of fees and expenses awarded to both Class Counsel and to UAW will be set forth in a supplemental order that will be incorporated into the court's judgment.

## G.  Settlement is Without Prejudice

108.    The parties have agreed that in the event the Settlement Agreement is terminated pursuant to its Sections 17 or 18, all parties will remain protected by the "No Admissions; No Prejudice" provisions set forth in Section 19 of the Agreement.  The court expressly confirms the provisions of Section 19 of the Settlement Agreement, and incorporates them herein as if fully set forth.

## H.  Indemnification

109.    In the Settlement Agreement, the parties have agreed that GM will indemnify UAW, and its officers, directors, and employees, and reimburse their reasonable attorneys' fees and expenses on the basis set forth in Section 20.A of the Settlement Agreement.  The court finds such a provision is reasonable.

## I.  Releases

110.    In consideration of GM's entry into the Settlement Agreement, and the other obligations of GM contained therein, the Class Representatives, the Class Counsel, and the UAW consent to the entry of this Judgment, which will be binding upon all Class Members pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.  All of the release provisions set forth in the Settlement Agreement shall be binding upon the parties and Class Members as set forth in that Agreement.

## J.  Retention of Jurisdiction

111.    Pursuant to Section 22.B of the Settlement Agreement, the court  retains exclusive jurisdiction to resolve any disputes relating to or arising out of or in connection with the enforcement, interpretation or implementation of the Settlement Agreement.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 382 (1994) (a district court retains jurisdiction to enforce a settlement agreement if it either (1) has language in the dismissal order indicating its retention of jurisdiction, or (2) incorporates the terms of the settlement agreement into the dismissal order); *RE/MAX Int'l, Inc. v. Realty One, Inc.,* 271 F.3d 633, 645 (6th Cir. 2001) (same).

47

## III.  CONCLUSION

112.   For the foregoing reasons, the court **APPROVES** the parties' Settlement Agreement in all respects and as to all parties, including GM, UAW, Class Representatives, and Class Members.  The plaintiffs' claims, including the claims of the Class, are hereby **DISMISSED** with prejudice pursuant to Fed. R. Civ. P. 41(a)(2) and 23(e)(1)(A) and (C), subject to the court's retention of jurisdiction as stated above.


S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  March 31, 2006


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 31, 2006, by electronic and/or ordinary mail.

S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

48